William E. COBB, Appellant (49570),

v.

MIDWEST RECOVERY BUREAU COM-
PANY, Defendant and Third-Party
Plaintiff, Respondent,

Mack Financial Corporation, Third-Party
Defendant, Appellant (49529).

Nos. 49529, 49570.

Supreme Court of Minnesota.

Feb. 29, 1980.

As Amended on Denial of Rehearing
Aug. 26, 1980.

Stefanson, Landberg & Alm and Mary Muehlen Maring, Moorhead, for Cobb.

Thysell, Gjevre, McLarnan & Hannaher and Paul O. Skatvold, Moorhead, for Mack Financial Corp.

Scanlan & Carlson and John J. Scanlan, St. Paul, for respondent.

Heard before OTIS, ROGOSHESKE, and YETKA, JJ., and considered and decided by the court en banc.

OTIS, Justice.

Plaintiff sued the financing company and the financing company's repossession agent for compensatory and punitive damages for wrongful repossession when his truck was repossessed because of his failure to make timely payments. The jury awarded plaintiff a total of $3,753.74 compensatory damages and $20,000 punitive damages. The court also held that the repossession company could get nearly complete indemnity from the finance company pursuant to their agency agreement. The finance company appealed and the plaintiff cross-appealed.

We affirm the holding of wrongful repossession but reverse the award of punitive damages.

Plaintiff William E. Cobb is a truck driver whose truck was repossessed by defendant Midwest Recovery Bureau Company acting as an agent for defendant Mack Financial Corporation because of Cobb's failure to make timely payments on his retail installment purchase contract with Mack Financial Corporation.

Cobb purchased the Mack tractor on December 23, 1971, from Mack Trucks, Inc. in Dallas, Texas, for $28,886.24 of which $23,886.24 was to be paid under an installment contract and $5,000.00 as a down payment in the form of the trade-in of his old tractor. The installment contract was for forty-eight monthly payments of $497.63 each.

The contract contains a time-of-the-essence clause which states in part:

Time is of the essence of this contract. If buyer shall fail to pay any installment when due hereunder, * * * then the full amount of the time balance shall become immediately due and payable. Thereupon, seller may take immediate possession of the property, including all equipment, attachments and accessories thereto, without notice or demand.

The contract also contains the following language:

No amendment of this contract shall be binding upon the seller unless in writing and signed by its duly authorized representative. * * *. Any waiver of any breach or default shall not constitute a waiver or any other or subsequent breach or default.

By November 6, 1973, Cobb was two payments behind schedule. On that date Cobb and Mack Financial Corporation, the assignee of the contract from Mack Trucks, Inc., entered into their first extension agreement under which the two delinquent payments were added onto the end of the contract. Eleven months later, on October 15, 1974, Cobb and Mack entered into another extension agreement. At that time Cobb owed $9,454.94 on the contract. This second extension required the balance to be paid in nineteen monthly payments equal to the monthly amount due under the original contract, i. e., $497.63. Cobb never made a payment on time under the second extension.[1]

On November 12, 1974, less than one month after the second extension was executed, Cobb was overdue on his payments and Mack sent him a letter telling him that if the account ran into default, the company would be "forced to make a demand for the full unpaid balance owing." No mention of repossession was made. In 1975 several letters were sent which threatened to terminate his financing agreement unless he brought his account up to date or made arrangements to do so. None of these letters mentioned that repossession would occur and none of the letters constituted a termination of the contract. The October 16, 1975, letter indicates that if Cobb did not contact one of Mack's district collection managers by October 25, 1975, then Mack would have "no alternative other than to pursue a course of action as outlined in your contract."

A November 18, 1975, letter from the district collection manager with whom Cobb normally dealt threatened that unless at least one installment of the three overdue payments was made by November 25, 1975, Mack would "have no other alternative than to terminate your financing agreement * * *." Cobb did not make another payment until January 5, 1976, well after the November 25, 1975, deadline. No action was taken by Mack at that time and the payment was accepted. Until March 28, 1976, Mack did not repossess, did not take any action to repossess, did not demand full payment, and did not notify Cobb that the contract was terminated. Mack never refused a late payment and regularly entered late charges on its books. At the time of the repossession, Sunday, March 28, 1976, Cobb was two payments behind and had only four payments totaling about $2,000.00 remaining to be paid.

Mack hired Midwest on or about March 19, 1976, to repossess Cobb's truck. Midwest located the truck on or about Saturday, March 27, 1976, when someone from Glyndon, Minnesota, contacted Donald Peterson, Midwest's agent in charge of this repossession. Peterson then arranged for the Glyndon police officer to meet two of Peterson's agents at the Fargo airport at noon on Sunday, March 28, 1979, in order to transport the two agents to Cobb's truck.

When Midwest's agents arrived at the truck, they disconnected the trailer and began to drive away. However, an air bag for the rear axle became over-inflated with the result that the drive axle could not get any traction. Eventually the air bag ruptured and the tractor again had traction and was driven away.

The truck was driven to Peterson's house in Burnsville, Minnesota, where it was left unattended for about twenty minutes during which time Peterson contacted Dale

1. The following summarizes Cobb's payments.

| Due Date | Date Paid | Amount Paid | Late Charges Paid |
|---|---|---|---|
| 11–6–74 | 11–13–74 | $497.63 | 0 |
| 12–6–74 | 12–11–74 | $497.63 | 0 |
| 1–6–75 | 1–28–75 | $497.63 | 0 |
| 2–6–75 | 2–19–75 | $497.63 | 0 |
| 3–6–75 | 4–29–75 | $497.63 | 0 |
| 4–6–75 | 6–2–75 | $497.63 | 0 |
| 5–6–75 | 7–28–75 | $497.63 | 0 |
| 6–6–75 | 7–28–75 | $497.63 | 4.74 |
| 7–6–75 | 10–13–75 | $497.63 | 2.37 |

| Due Date | Date Paid | Amount Paid | Late Charges Paid |
|---|---|---|---|
| 8–6–75 | 11–12–75 | $497.63 | 2.37 |
| 9–6–75 | 1–5–76 | $497.63 | 2.37 |
| 10–6–75 | 1–9–76 | $497.63 | 2.37 |
| 11–6–75 | 1–16–76 | $497.63 | 2.37 |
| 12–6–75 | 3–22–76 | $497.63 | 2.37 |
| 1–6–76 | 3–26–76 | $497.63 | 2.37 |
| 2–6–76 | 3–31–76 | $497.63 | 0 |
| 3–6–76 | 6–24–76 | $497.63 | 2.37 |
| 4–6–76 | 10–13–76 | $497.63 | 0 |
| 5–6–76 | 10–13–76 | $ 2.35 | 0 |
| 5–6–76 | 1–12–78 | $495.28 | 0 |

Hedtke, president and sole owner of Midwest, who told Peterson to take the truck over to Midwest's storage warehouse. Because the truck would not fit through Hedtke's warehouse door, Hedtke called Graham Towing Company who towed the truck to their fenced storage lot that Sunday night. The truck was not locked at anytime after the repossession.

After the truck arrived at Midwest's warehouse, Hedtke removed a handgun from the truck for safe-keeping. No inventory of the property in the truck was taken and no steps were taken to protect the property in the truck other than the gun. As a result various items of Cobb's personal property disappeared from the truck.

On Monday or Tuesday, March 29 or 30, 1976, Midwest had the truck towed by Graham to Mack Truck's offices in Roseville at the direction of Mack Financial Corporation. On Tuesday Cobb arrived in the Twin Cities to recover his truck. He was told that he had to pay the repossession costs and one monthly payment (although he was two behind) and that he had to sign a release or his truck would not be returned to him. He talked to his attorney who told him not to sign. However, an agent of Mack Financial Corporation said that he had to sign it and that it did not affect any possible claim against Midwest. Cobb signed the release and paid the money. He then inspected the truck and made a list of the damage done to it. Mack paid the $528.44 for the repairs of the truck. Cobb signed another release after the repairs were completed. Cobb was never compensated either for the loss of income for the time during which he did not have use of the truck or for the loss of his personal property which was taken from the truck.

At the close of Cobb's case-in-chief the court held that the repossession was wrongful as a matter of law and that the releases signed by Cobb were void for lack of consideration. The judge left the issues of compensatory and punitive damages to the jury. The jury returned a verdict awarding Cobb compensatory damages in excess of what he had pleaded in his complaint. Spe-cifically, the jury awarded Cobb $645.69 for his loss of personal possessions from the truck and $608.05 for the repossession charges he had paid. Even though he had claimed only $2,200.00 in lost profits from the loss of use of the tractor, the jury awarded him $2,500.00. The court granted Cobb's motion to amend his complaint to conform to the award. No damages were awarded for costs for repair of the truck because Mack had never charged Cobb for repairs.

The jury also found that Midwest was liable for $20,000.00 punitive damages and that Mack was liable for $20,000.00 punitive damages. The court ruled that Mack and Midwest were jointly and severally liable for $3,753.74 for compensatory damages and for $20,000.00 for punitive damages plus interest and costs, and that Midwest was entitled to indemnity from Mack for all amounts due except the $645.69 plus interest for the lost property. The court also ruled that the jury verdict regarding punitive damages against Mack was based on *respondeat superior* and not on Mack's independent acts. Thus Cobb could recover a total of only $20,000.00 punitive damages rather than a separate $20,000.00 from both Mack and Midwest, or $40,000.00 from Mack under both its independent liability and *respondeat superior*.

Mack appealed on the issues of whether the repossession was wrongful as a matter of law and whether the punitive damages were recoverable at all and if recoverable, whether they were excessive. Cobb cross-appealed on whether the award of punitive damages of $20,000.00 against each of the defendants separately would be double recovery. Midwest did not appeal and did not file a brief as a respondent.

1. Courts have adopted two basic rules for interpreting U.C.C. § 9–503 (Minn.Stat. § 336.9–503 (1978)) where repeated late payments have been accepted by a creditor who has the contractual or statutory right to repossess the collateral without notice. Some courts have held that the acceptance of late payments does not waive or otherwise affect the right of a creditor to repos-

sess without notice after subsequent late-payment defaults. *E. g., Hale v. Ford Motor Credit Co.*, 374 So.2d 849, 26 U.C.C.Rep. 1383 (Ala.1979). In *Hale* the following question was certified to the Alabama Supreme Court by the Fifth Circuit Court of Appeals:

> Where a security agreement containing non-waiver acceleration, and non-modification clauses is in default in payment, is the secured party required to give notice to the buyer prior to repossession when past due payments have been repeatedly accepted * * * ?

*Id.* at 852, 26 U.C.C.Rep. at 1386. The Alabama court held that no notice was required.

Other courts, an apparent majority of states which have considered the issue, have imposed a duty on the creditor to notify the debtor that strict compliance with the time for payment will be required in the future or else the contract remedies may be invoked. *E. g., Ford Motor Credit Co. v. Waters*, 273 So.2d 96 (Fla.App.1973); *Pierce v. Leasing Int'l, Inc.*, 142 Ga.App. 371, 235 S.E.2d 752, 23 U.C.C.Rep. 829 (1977); *Nevada Nat'l Bank v. Huff*, 582 P.2d 364, 24 U.C.C.Rep. 1044 (Nev.1978); *Lee v. Wood Prods. Credit Union*, 275 Or. 445, 551 P.2d 446 (1976); *Ford Motor Credit Co. v. Washington*, 573 S.W.2d 616, 25 U.C.C.Rep. 907 (Tex.Civ.App.1978).

In a case remarkably similar to the instant one on its facts, the Nevada Supreme Court held that where in the course of performance the debtor was late on every payment and had been two and three payments behind on occasion, the secured party had a duty to give notice to the debtor that "strict compliance with the terms of the long-ignored contract would henceforth be required in order to avert repossession of the vehicle." *Nevada Nat'l Bank v. Huff*, 582 P.2d 364, 370, 24 U.C.C.Rep. 1044, 1050 (Nev.1978). The Nevada court summarized the law as follows:

> Clearly there is nothing unconscionable in a contract clause authorizing the repossession of a chattel upon default. Indeed, Article 9–503 of the UCC specifically au-thorizes such self-help remedies upon the condition that they be carried out without breach of the peace. Further, an established course of dealing under which the debtor (lessee) makes continual late payments and the secured party (lessor) accepts them does not result in a waiver of the secured's [sic] party's right to rely upon a clause in the agreement authorizing him to declare a default and repossess the chattel.
>
> However, it is clear that even though no outright waiver of a secured party's right to rely upon such a clause occurs through a course of dealing involving the acceptance of late payments, a secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must*, before he may validly rely upon such a clause *to declare a default and effect repossession, give notice* to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided.

*Id.* at 369, 24 U.C.C.Rep. at 1049 (citations omitted) (emphasis original).

The basis for imposing this duty on the secured party is that the secured party is estopped from asserting his contract rights because his conduct had induced the justified reliance of the debtor in believing that late payments were acceptable. The acts which induced reliance are the repeated acceptances of late payments and the occasional late charges assessed. The reliance is evidenced by the continued pattern of irregular and late payments. Mack argues that there could be no reliance because Cobb knew that the contract provided for repossession when payments were delinquent. Cobb argues that actual proof of reliance is not necessary under this rule. Instead, Cobb argues that the debtor has the *right to rely* on the continuation of the course of performance and that the right to rely is sufficient to satisfy the reliance element. This right to rely theory was expressly adopted in *Ford Motor Credit Co. v. Waters*, 273 So.2d 96 (Fla.App.1973), and is sup-

ported by the policy of the U.C.C. which encourages the continued development of "commercial practices through custom, usage, and agreement of the parties." U.C.C. § 1–102(2) (Minn.Stat. § 336.1–102(2) (1978)).

Both the debtor and the creditor are protected under the *Huff* rule. The debtor would be protected from surprise and from a damaging repossession by fore-warning that late payments would no longer be acceptable. The creditor is protected because, by the device of one letter, the creditor can totally preserve its remedies so that if the account continues in default, repossession could be pursued as provided in the contract without further demand or notice. We recognize that this rule does place the creditor in a slightly worse position than the rule that repeated acceptance of late payments has no effect, because, if the creditor sends a letter to preserve its rights and then once again accepts late payments, another notice would be required. The second notice would be required because the acceptance of the late payment after the initial letter could again act as a waiver of the rights asserted in the letter.

■ We hold that the repeated acceptance of late payments by a creditor who has the contractual right to repossess the property imposes a duty on the creditor to notify the debtor that strict compliance with the contract terms will be required before the creditor can lawfully repossess the collateral.

■ 2. The essential features of the conduct of Cobb and Mack after the second extension agreement was signed are as follows:

1. Cobb never made a payment on time;

2. Cobb was generally two or more months behind on payments;

3. Mack accepted every late payment and assessed late charges on some of them;

4. Mack sent several letters to Cobb threatening to terminate the contract or to pursue the contract remedies unless payment was received by certain deadlines. However, Mack failed to carry out its threats and accepted payments tendered up to five weeks after the deadlines;

5. Mack did not notify Cobb that the contract was terminated; and

6. Mack did not notify Cobb that it was going to repossess the truck.

These facts establish that the repossession was wrongful as a matter of law. The trial court's ruling on wrongful repossession is affirmed.

■ 3. Because the truck was wrongfully repossessed, the first release was clearly without consideration because Cobb had a legal right to his truck at that time. The trial court also held that the second release, executed after the truck was repaired, was without consideration because the repossession was wrongful. Mack argues that the repair of the truck for no cost to Cobb constitutes independent consideration. However, this argument ignores the fact that the repairs were necessary only because of the repossession. Thus Mack had a pre-existing duty to return the truck to Cobb in the same condition it was in when Mack repossessed it. Because the repossession was wrongful, the trial court's rulings on the releases were correct.

■ 4. Generally, punitive damages are allowed only for conduct which is done with malicious, willful, or reckless disregard for the rights of others. *Huebsch v. Larson*, 291 Minn. 361, 364, 191 N.W.2d 433, 435 (1971); *Vine v. Casmey*, 86 Minn. 74, 76, 90 N.W. 158, 158 (1902). Punitive damages are not recoverable where the wrongful conduct is merely negligent or where it is done with a good faith reasonable interpretation of a statute which had not been construed by this court.

■ As noted above, there is a split of authority regarding the interpretation of U.C.C. § 9–503 (Minn.Stat. § 336.9–503 (1978)). Defendant Mack reasonably believed in good faith that under the contract and statute it could lawfully repossess the tractor. Had this court adopted the Ala-

bama rule decided in *Hale v. Ford Motor Credit Co.*, 374 So.2d 849, 26 U.C.C.Rep. 1383 (Ala.1979), defendant Mack would not have been found to have wrongfully repossessed the collateral. However, we adopted what we consider the better rule and Mack is therefore liable for compensatory damages. Because of this good-faith dispute over the law, Mack is not liable for punitive damages for any acts of its own.

■ Midwest failed to exercise due care in preventing injury to the truck and in preventing the loss of plaintiff's personal property after the truck was repossessed. For its negligence Midwest must compensate plaintiff Cobb. However, we hold that Midwest's conduct does not rise to the level of willful or reckless disregard for the rights of the plaintiff.

In *Huebsch v. Larson*, 291 Minn. 361, 191 N.W.2d 433 (1971), three calves owned by the plaintiff wandered onto the defendant's land. The defendant watered and fed calves for nine days while he contacted a few neighbors to find the owner. The defendants then sold the calves. At about the same time as the sale, plaintiff directly asked defendant about the calves. Defendant denied any knowledge of the calves until nine days later when the sheriff investigated and told the defendant to inform the plaintiff that the calves had been sold. The court held that punitive damages may be recovered for the conversion of the personal property.

In the instant case there is no evidence of any conversion of the personal property by Midwest or its agents. They did not lock the truck and it was left overnight in an open, but fenced and locked yard. While such actions do not constitute the exercise of due care, they do not rise to the level of reckless disregard of the plaintiff's property rights. Plaintiff's handgun was removed from the truck and safely returned to him by Midwest. Absent a showing of conversion or of less concern for plaintiff's rights, the award of punitive damages against Midwest cannot stand.

We affirm in part and reverse in part with instructions to enter judgment without an award of punitive damages.

TODD, J., took no part in the consideration or decision of this case.