A.P. DEVELOPMENT CORPORATION, T/A STONEY FIELDS ESTATES, PLAINTIFF–RESPONDENT, v. THOMAS BAND AND KATHY BAND, DEFENDANTS–APPELLANTS.

Argued September 14, 1988—Decided December 22, 1988.

486

*Olga K. Arthars* argued the cause for appellants (*J. Paul Mohair*, Director, Cape–Atlantic Legal Services, Inc., attorney).

*Charles T. Eckel* argued the cause for respondent.

*Felipe Chavana*, Senior Attorney, argued the cause for *amicus curiae*, Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, Legal Services of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns a tenant's eviction for habitual late payments of rent under New Jersey's Anti–Eviction Act, *N.J. S.A.* 2A:18–61.1 to –61.12 (the Act). We find that the course of dealings between the landlord and tenants after the landlord served the tenants with Notice to Cease was such that the landlord was required to afford them subsequent notice that the terms of the Notice to Cease would be strictly enforced. We hold that the landlord could not proceed in evicting the tenants since it failed to provide them with such notice.

I

The defendants, Thomas and Kathy Band, own a mobile home. Sometime in 1983 they leased mobile home Lot 1001, Stoney Fields Estates, from the plaintiff, A.P. Development Corp., t/a Stoney Fields Estates (the landlord).

On June 24, 1983, the Bands (the tenants) entered into a renewal of their month-to-month lease, whereby they agreed to pay their rent on the first day of the month. The Renewal Agreement was also subject to the terms and conditions of a Tenancy Agreement that Thomas Band signed on August 1, 1983.

Section 2 of the Tenancy Agreement provides as follows:

2. A late charge of the maximum amount permitted by law will be levied on residents paying after the 15th of the month. When the 15th is a Sunday or Legal Holiday the deadline will be the next Business Day. A service charge of $10.00 will be levied for any checks returned unpaid for any reason. These

additional sums shall be due and payable as additional rent with the regular rental payment. <u>Tenant hereby agrees to pay rent on the first day of each and every month at the agreed upon rent. In the event that it becomes necessary for the landlord to seek legal services for the purposes of collection of the rent or for the purposes of eviction of a tenant for non-payment of rent, late payment of rent or other breach of the terms and conditions previously set forth, tenant agrees to pay to the landlord a sum equal to the amount expended by the landlord for enforcement of landlord's rights and that said sum shall be considered as additional rent payable on the first day of the following month.</u> (emphasis added.)

The underlined portion of Section 2 was set forth as a specific term and condition in the Renewal Agreement dated June 24, 1983.

On December 14, 1984, the landlord sent the tenants, through certified mail, Notice to Cease Late Payments, which provided:

Your account has been turned over to me for the purpose of filing an eviction action for late payments of your rent. Late payment of rent is a violation of your Lease and demand is hereby made that you cease all further such late payments. I have been advised by your landlord to proceed with eviction action on the ground of habitual late payment of rent in the event that you continue said late payments beyond the date of this notice.

Your rent is due on the first day of each month and rent received after that time is deemed to be late.

This notice was received by Thomas Band on December 29, 1984.

During the sixteen months after the receipt of this Notice to Cease the tenants continued to make late rental payments each and every month, averaging between fifteen and twenty-eight days late. During this period they received monthly notices from the landlord reminding them that their rent was late. On April 21, 1986, sixteen months after receipt of the Notice to Cease, the landlord served the tenants by certified mail, with a Notice to Quit and Demand for Possession, that read as follows:

You have previously been sent demands to cease your late payments of rent, but have failed to comply with those demands. Demand is therefore made, now, that you vacate the premises no later than May 31, 1986, and return possession thereof to your landlord.

In the event that you do not vacate the premises by May 31, 1986, a Complaint will be filed in the Atlantic County District Court.

The Notice to Quit was received by Mrs. Band's son. After receiving the Notice to Quit, Mrs. Band paid the May rent in a

timely fashion. She then sent a check for June's rent to the landlord on May 31, 1986. The landlord refused to accept this check. The reason he proffered for doing so was that dispossession proceedings had already been instituted.

On June 18, 1986, the landlord, pursuant to *N.J.S.A.* 2A:18–61.1 j, filed a dispossess action alleging habitual late payment of rent. The trial court found that "the letter of the law has been met" with regard to the landlord's right to evict the tenant. Nevertheless, the trial court dismissed the complaint, concluding:

> It seems to me that they've ... that the landlord has lulled the tenant into a false sense of security at that point by * * * accepting the rent late, and not making an issue of it, and although I think the landlord may be technically correct here, it just ... doesn't strike me as being right, and I think that there was a waiver of the notice, and I so hold. And I'm going to dismiss the plaintiff's complaint. And I don't know what the cutoff time is. I don't know whether a landlord has to ... do something within two months or three months, or four months, five months, or twelve months * * *.

On the landlord's appeal, the Appellate Division reversed and remanded the case to the trial court. It held that there was "no basis, legally or factually for the court's finding that defendants were lulled 'into a false sense of security.' " It reasoned that:

> There must be a balance struck between when it is reasonable to conclude that a pattern of habitual late payment has been established following written notice and the point where the tenant might reasonably come to conclude that the property owner has given up the right to receive rent in a timely fashion as demanded in the written notice.
>
> On the record before us we find that neither the passage of time nor the landlord's inaction were [sic] sufficiently in derogation of the notice to cease as to render it ineffective. Indeed the landlord consistently attempted to enforce compliance with its right to timely payment of rent.

We granted certification. 109 *N.J.* 504 (1987).

The trial court and the Appellate Division considered only copies of the Renewal Agreement dated June 24, 1983, the Notice to Cease and the Notice to Quit. Although the parties agreed that the landlord sent monthly letters to the tenants concerning their late payments of rent, neither court received any of these letters. On request of this Court, both parties

submitted copies of several of the landlord's letters to the tenants notifying them of their late payment of rent.

A review of these monthly letters unveils the course of dealings between the parties. The first letter dated March 6, 1984, indicates that the February rent was not fully paid and that all the March rent was due. This is the only letter received by the tenants that actually threatened eviction. A $10.00 late charge was also requested in this letter. In May, July, September, and November of 1984 the tenants received letters indicating that the rents for those months were past due. None of these letters threatened eviction or requested a late charge. The July, September, and November letters, however, did threaten "further actions."

The Notice to Cease, dated December 14, 1984, seems to have had little impact on the course of dealings between the parties. In January, February, March, and April of 1985, the landlord sent letters identical to those sent prior to the Notice to Cease in July, September, and November of 1984. Typical of the form letter sent is the letter dated November 13, 1984, that reads:

Dear Mr. and Mrs. Band:

Our records indicate you have not paid your lot rent for the month of November as of this date.

We would appreciate your remittance within five days of the date of this notice to avoid any further actions. We will be unable to accept any payments that are not for the full amount of the balance due.

If you have any questions concerning this matter, please feel free to contact our office.

Thank you,

Pam Imprescia

Similar letters were sent in May and June of 1985. However, in these two letters the landlord notified the tenants that a $10.00 late charge had been added to their account.

The last two letters received by the tenants prior to service of the Notice to Quit that have been furnished to the Court are dated December 13, 1985, and February 24, 1986. These letters are identical. Both were similar to the prior form letters in that they advise the tenants that a $10.00 late charge had been

added to their account; yet they *did not* threaten "further actions." The February letter reads:

> Dear Mr. and Mrs. Band:
>
> Our records indicate you have not paid your lot rent for the month of February as of this date. A late charge of $10.00 has been added to your account. We would appreciate your remittance within five days of the date of this notice. We will be unable to accept any payments that are not for the full amount of the balance due.
>
> If you have any questions concerning this matter, please contact our office. Your anticipated cooperation in this matter will be greatly appreciated.
>
> > Thank you,
> > Pam Imprescia

On April 21, 1986, the Notice to Quit was served on the tenants.

Our review of these communications leads us to conclude that the landlord could not evict the tenants without first affording them with reasonable notice that the terms of the Notice to Cease would be strictly enforced. Hence, we reverse the judgment of the Appellate Division.

## II

Plaintiff's action was instituted under the Anti–Eviction Act. The Act, which was passed in 1974, *L.*1974, *c.* 49, flowed from a recognition of the severe housing shortage in the state. In promulgating the Act, the Legislature noted that its purpose was to limit evictions to situations in which a landlord had reasonable grounds *and* provided suitable notice:

> At present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant.... This is a serious matter, particularly now that there is a critical shortage of rental housing space in New Jersey. *This act shall limit the eviction of tenants by landlords to reasonable grounds and provide that suitable notice shall be given to tenants when an action for eviction is instituted by the landlord.* [Statement attached to Act when it was proposed in the Assembly, *L.*1974, *c.* 49 (emphasis added).]

We take judicial notice that the housing shortage remains severe in New Jersey. This is evident from the 1986 amendment to the Act, *N.J.S.A.* 2A:18–61.1 a, *L.*1986, *c.* 138 (enacted October 1986).

The Act indeed changed the legal relationship between landlords and most residential tenants in the state. *See* Comment,

*New Jersey's Anti Eviction Act, N.J.Stat.Ann. §§ 2A:18–61.1 to –61.12 (West Cum.Supp.1980–81), Prohibits Removal of Tenants by Foreclosing Mortgagee Upon Default of Land-lord–Mortgagor, Absent "Good Cause", 11 Seton Hall L.Rev. 311, 312 (1980) (Removal of Residential Tenants ).* Prior to its passage, the summary dispossess action "provided for an expedited judicial determination of who is entitled to possession as between the tenant and landlord." *Removal of Residential Tenants, supra,* 11 *Seton Hall L.Rev.* at 313. The trial court's decision on possession was final and the tenant was remitted to an action for damages. *Vineland Shopping Center, Inc. v. DeMarco,* 35 *N.J.* 459, 462 (1961).

Conversely, the Act now mandates that no tenant may be removed from premises leased for residential purposes unless good cause is established. *N.J.S.A.* 2A:18–61.1. Eighteen separate grounds for good cause are enumerated in thirteen subsections of the Act. *Ibid.*

In this case, the plaintiff alleges that he has "good cause" to evict the defendants because they violated *N.J.S.A.* 2A:18–61.1 j, which provides that a tenant may not be removed unless "[t]he person, after written notice to cease, has habitually and without legal justification failed to pay rent which is due and owing." [1] This section has been interpreted to encompass ha-

---

[1]The parties have presented the issue to us in the context of *N.J.S.A.* 2A:18–61.1 j, which has been interpreted to afford a basis for "habitual late payment of rent" evictions. *See 534 Hawthorne Ave. Corp. v. Barnes,* 204 *N.J.Super.* 144, 148 (App.Div.1985): *Scugoza v. Stockton,* 166 *N.J.Super.* 122, 123 (App.Div.1979). We note that *N.J.S.A.* 2A:18–61.1 d provides for eviction if the tenant has "continued, after written notice to cease, to substantially violate or breach any of the landlord's rules and regulations governing said premises, provided such rules and regulations are reasonable and have been accepted in writing by the tenant or made a part of the lease at the beginning of the lease term." In certain cases, depending on the provisions of the lease or the landlord's rules and regulations, and the extent to which payments are late, actions for eviction may more appropriately be instituted under subsection 1 d rather than 1 j. We need not decide which of these subsections is the

bitual late payments of rent, even though it refers to "failure to pay," rather than late payment. *534 Hawthorne Ave. Corp. v. Barnes*, 204 *N.J.Super.* 144, 148 (App.Div.1985).

In reaching this conclusion, the *Hawthorne* Court relied on *Scugoza v. Stockton*, 166 *N.J.Super.* 122, 123 (App.Div.1979). In *Scugoza* the tenant failed entirely to pay rent. In deciding that notice was not necessary in such a case, the court in *Scugoza* stated:

> We read subsection 61.1(j) as authorizing eviction of a tenant who has been *habitually* and unjustifiably late in his rent payments after written notice to cease late payment has been given, and after the landlord "has made written demand and given written notice for delivery of possession of the premises." *N.J.S.A.* 2A:18–61.2. Hence, in such cases the tenant has paid his rent, albeit on a routinely late basis. In such cases, notice is required. Where, however, the tenant has failed entirely to pay the rent due and owing * * * eviction is available under section 61.1(a) and notice complying with *N.J.S.A.* 2A:18–61.2 is expressly excused thereby. [166 *N.J.Super.* at 123.]

In *Hawthorne, supra*, 204 *N.J.Super.* at 144, the tenant paid rent late for ten consecutive months. The landlord then served the tenant on July 4, 1984, with a Notice to Cease Late Payment of Rent. On July 27, 1984, the landlord served the tenant with a Notice to Quit and Demand for Possession as of September 1, 1984. July rent was paid on July 28, 1984. The court held that the record of late payments, followed by the Notice to Cease, and further followed by a single late payment was not sufficient to constitute "good cause" under *N.J.S.A.* 2A:18–61.1 j. *Id.* at 147. The court interpreted the Act to require habitual late payments *after* the Notice to Cease had been served. One reason for its conclusion was that

> [t]he plain meaning of the words used, given their position in the single sentence of subsection 61.1j, is that "habitual" failure to pay (in this case "late" payment) must follow the written notice to cease. It is undisputed, of course, that habitual means more than a single instance. Accordingly, there must be more than one late payment following notice.
> [*Ibid.*]

---

appropriate basis for the eviction proceeding in this case, that issue not having been presented by this appeal.

The *Hawthorne* rationale does not impugn the landlord's position in this case since there were sixteen instances of "habitual" late payments by the tenants. The landlord also technically complied with the notice requirements of the Act. *N.J.S.A.* 2A:18–61.2 b provides that the landlord shall make written demand and give written notice for delivery of possession of the premises one month prior to the institution of an action for possession under sections 61.1 d, 61.1 e or 61.1 j. Such notice shall specify in detail the cause of the termination of the tenancy and "shall be served either personally upon the tenant or lessee or such person in possession by giving him a copy thereof, or by leaving a copy thereof at his usual place of abode with some member of his family above the age of 14 years, or by certified mail." *N.J.S.A.* 2A:18–61.2.

Here, the landlord sent the tenants Notice to Cease Late Payments of Rent as required by *N.J.S.A.* 2A:18–61.1 j. Thereafter, the rent was habitually paid late. *N.J.S.A.* 2A:18–61.1 j; *Hawthorne, supra,* 204 *N.J.Super.* at 147. The landlord then sent the tenants a Notice to Quit, allowing them a month to vacate the premises. *N.J.S.A.* 2A:18–61.2 b. Both Notices were properly sent by certified mail and received by an adult member of the family. *N.J.S.A.* 2A:18–61.2.

We find no merit in Mrs. Band's contention that the Notice to Cease as served did not constitute sufficient notice to her. Although she and her husband were living together when the Notice to Cease was sent by certified mail and received by Thomas Band, the two separated in the ensuing year. Consequently, Mrs. Band testified that she never had actual written or oral notification of the Notice to Cease. Service by certified mail is valid notice under *N.J.S.A.* 2A:18–61.2. Mrs. Band acknowledged that she received the monthly notices of late payments of rent and the Notice to Quit.

### III

The Act does not specify any limit on the number of months that must pass before the Notice to Cease becomes ineffective

or must be reissued, nor does it state how many late payments of rent constitute "habitual" late payment of rent under the statute.  In *534 Hawthorne Ave. Corp. v. Barnes, supra,* 204 *N.J.Super.* at 148, the Appellate Division held that there must be more than one late payment of rent before the landlord can evict a tenant for "habitual" late payment of rent. *See Tower Management Corp. v. Podesta,* 226 *N.J.Super.* 300, 305 (App. Div.1988) (two late payments after Notice to Cease, one which was a few days late but with an explanation, were insufficient to establish that tenant habitually failed to pay rent under *N.J.S.A.* 2A:18–61.1).

█ In this case, sixteen months passed between the Notice to Cease and the Notice to Quit and Demand for Possession. The tenants argue that the amount of time it took the landlord to act was unreasonable, rendering the Notice to Cease ineffective.  In any event, the tenants urge that a sixteen month period between the Notice to Cease and Notice to Quit is *per se* too long a period and request that we establish a reasonable period of time within which Notice to Quit must be served.  We decline to establish any particular time limit.  We agree with the landlord's position that "habitual" is a function of time and circumstances.  To apply a strict time limitation rule will result in unfairness in certain instances.  A more flexible time period affords tenants a greater opportunity to change their pattern of late payments of rent.  Indeed, a strict time limit may, under certain circumstances, force a landlord to institute an eviction action against a tenant sooner than he or she would have in the absence of a time limit.

We also are unpersuaded by the tenant's contention that the landlord forfeited his right to evict them for late payment of rent under the doctrines of equitable estoppel and laches.  To establish a claim of equitable estoppel, the party claiming the benefit of the estoppel must show

that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would

induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.
[*Miller v. Miller*, 97 *N.J.* 154, 163 (1984) (citations omitted).]

See *Royal Assocs. v. Concannon*, 200 *N.J.Super.* 84, 93 (App. Div.1985) (holding that both equitable and promissory estoppel justified preventing a landlord from evicting a tenant for keeping a dog, after he had given the tenant oral permission to have the dog, despite a no-pets lease provision).

▪ In this case, the doctrine of equitable estoppel is not applicable. No act or omission of the landlord induced the tenants not to pay their rent on time or caused them to change their position to their detriment. The tenants were already paying their rent late, in violation of the lease, when the landlord sent the Notice to Cease. Further, they consistently continued to pay their rent late after receipt of this Notice. Moreover, the lapse of time between the landlord's service of the Notice to Cease and the termination of the tenancy was not prejudicial to the tenant. To the contrary, it afforded them an opportunity to correct their habitual late payment of rent.

▪ Likewise, the defense of laches is not applicable. We accept Pomeroy's definition of laches as " 'such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.' " *Lavin v. Board of Educ. of Hackensack*, 90 *N.J.* 145, 151 (1982) (quoting 2 *Equity Jurisprudence* § 419, at 171–72 (5th ed.1941)). Here, the landlord's lapse of time in sending the Notice to Quit *benefitted* rather than *prejudiced* the defendant.

▪ Similarly, we are unpersuaded by the tenants' contention that the landlord's acceptance of the rent and the late charge constituted a "waiver," traditionally defined as "an intentional relinquishment of a known right." *Jasontown Apartments v. Lynch*, 155 *N.J.Super.* 254, 259 (App.Div.1978). Before the landlord can initiate an eviction proceeding based on

"habitual" late payment of rent, the landlord is obliged to accept a series of late payments in order to establish that the lateness is habitual. *548 Hawthorne Ave. Corp. v. Barnes, supra,* 204 *N.J.Super.* at 148. This action differs from an action instituted against a tenant for failure to pay rent pursuant to *N.J.S.A.* 2A:18–61.1 a. In that situation a tenant can be evicted without notice. *Scugoza v. Stockton, supra,* 166 *N.J. Super.* at 123. It is clear that the Anti–Eviction Act requires a continuing course of conduct by the tenant over a period of time and is not based upon a single late payment. It protects a tenant from being evicted for one late payment of rent. Inherent in this Act and its interpretation by the courts is the understanding that the landlord will continue to receive the rent, albeit late. We conclude, therefore, that the Legislature did not intend that a landlord's acceptance of late payments of rent and a late charge constitutes a waiver of the right to evict a tenant because of the tenant's habitual late payment of rent. *Accord Jasontown Apartments v. Lynch, supra,* 155 *N.J.Super.* at 263 (holding that acceptance of rent after termination proceeding poses fact question as to whether there has been a waiver, and limiting *Carteret Properties v. Variety Donuts, Inc.,* 49 *N.J.* 116, 129 (1967) to its facts).

Nor is this a case where the landlord made an affirmative representation to the tenants that they did not have to pay their rent on time. *See Sparks v. Lorentowicz,* 106 *N.J.Eq.* 178, 182 (E. & A.1929) (waiver found where landlord failed to rebuke tenant for late payments and tenant testified that landlord said he would be satisfied as long as he received rent by the end of the month). There is no evidence that the landlord made any affirmative representation to the tenants that they did not have to pay the rent on time. In fact, the landlord consistently notified the tenant that the rent was late and payment was due.

█ Nonetheless, while the letters flowing from late payments stated that the rent was overdue, these letters did not affirmatively inform the tenants that their failure to make

timely payments would result in their eviction. A reasonable tenant could read the letters where a late fee was added and assume that the payment of the late charge was sufficient to avoid eviction. *See Park Forest of Blackman v. Smith*, 112 *Mich.App.* 421, 316 *N.W.*2d 442, 445 (1982). Further, the last two letters the tenant received prior to receipt of Notice to Quit were less threatening than any of the prior letters; they did not even mention "further actions."

While the defenses of equitable estoppel, laches, and waiver are not applicable to this case, we do find the tenants' situation analogous to those cases in which the course of dealing between the parties altered contractual rights to prompt payment. An analysis of these cases discloses that the landlord's letters to the tenant concerning the late payment of rent established such a course of dealings between the parties. As a result, the landlord could not evict the tenants before giving them clear and reasonable notice that the terms of their agreement and its statutory rights would be strictly enforced.

## IV

In *Finn v. Glick*, 42 *N.J.Super.* 514, 520 (App.Div.1956); *Brown v. Ely*, 92 *N.J.Eq.* 487, 490 (Ch.Div.1921); and *Baerenklau v. Peerless Realty Co.*, 80 *N.J.Eq.* 26, 34 (Ch.Div.1912), New Jersey courts followed the general precept that terms of a contract that permit a party to terminate it by reason of late payment become inoperative and unenforceable due to a continued course of dealing of acquiescence to late payments. As these cases state, the favored party is unable to terminate without giving notice that strict adherence to the terms of the agreement will be required in the future.

Although all three of these cases involve land purchase contracts, we find them instructive. Other courts faced with forfeitures flowing from a tenant's failure to pay rent promptly have looked to land purchase cases for guidance. *See, e.g., Famous Permanent Wave Shops v. Smith*, 302 *Ill.App.* 178,

23 *N.E.*2d 767, 770–71 (1939), *Park Forest of Blackman v. Smith, supra,* 316 *N.W.*2d at 445, *Fritts v. Cloud Oak Flooring Co.,* 478 *S.W.*2d 8, 13 (Mo.Ct.App.1972). Granted, a forfeiture of land typically involves more pecuniary hardship than an eviction. However, given the acute housing shortage in this state, the total effect of forfeiture on the tenant can be comparable in severity to the effect of forfeiture on a purchaser of land.

In *Brown v. Ely, supra,* 92 *N.J.Eq.* at 487, the plaintiff purchased a lot from the defendant, payment to be made in monthly installments. Although the facts were in dispute, the court found that the defendant had given warning letters to the plaintiff, but subsequent to his receipt of such letters, an inadequate payment of his was tendered and accepted. This "appropriately justified complainant's belief that the old relations and course of dealings were re-established." *Id.* at 490. As the court in *Brown* stated:

> In these circumstances complainant was at least entitled to notice from defendant of a change of attitude on his part or a notice that his rights would be terminated unless he should promptly make payment of the then small final balance due. [*Ibid.*]

In *Finn v. Gluck, supra,* 42 *N.J.Super.* at 520, plaintiffs purchased land subject to an installment sale. Plaintiffs' payment of installments was very irregular. On July 14, 1953 defendants wrote plaintiffs threatening them with a forfeiture of all payments and all rights under the contract unless full payment was made by August 17, 1953. On August 15, plaintiffs paid part of the arrearages. However, their late payments continued. Approximately a year later defendants wrote a similar threatening letter to plaintiffs. Thereafter for eight months no payments were made. On November 23, 1955, defendants wrote a third letter precisely similar in form to the other two letters. Defendants finally moved to forfeit the contract. The court determined that the precise issue was "whether the last letter constitutes reasonable and, more than that, adequate notice to the plaintiffs...." 42 *N.J.Super.* at

519. The court considered the circumstances, particularly the two prior letters. It described the case as "a continuing picture of a multitude of defaults by the buyer, and on the other hand, of tolerance by the seller. . . ." *Id.* at 520. It concluded that

> *not only was the notice too short* under all the circumstances, *but the very manner of giving it—namely, by a letter which had now become a form letter little heeded by the parties and which plaintiffs would hardly regard as inexorable—did not adequately and fairly bring home to them that this was truly their last chance and that their payments on account would all be forfeited if they did not pay the balance before the deadline now fixed.* [*Ibid.* (emphasis supplied).]

In *Baerenklau v. Peerless Realty Co., supra,* 80 *N.J.Eq.* at 34, the complainants paid money irregularly. Sometimes they paid installments in advance, and then they fell behind and were in arrears. The payments made in arrearages were accepted, and they were never warned that further delinquencies would bring a forfeiture. Thus, the court concluded that the company's conduct amounted to a waiver of their right to claim "a forfeiture without notice, without warning, so that the complainants could again be put upon their guard." *Id.* at 34. The *Baerenklau* Court held that the parties "established an order of business inconsistent with the terms of this covenant." *Id.* at 34.

In the instant case, the tenants received form letters that neither referred to the Notice to Cease nor indicated that eviction would follow their continued failure to make timely payments of rent. In fact the tenants here received progressively less harsh letters from the landlord subsequent to their receipt of the Notice to Cease, the last two of which did not even threaten further actions. Admittedly, the landlord did protest the tenants' late payments through its letters, while in *Baerenklau* very little protest seems to have been made. Nonetheless, mere notice of late payment is not sufficient. Here as in *Finn* the letters clearly were congenial form letters. This course of dealings made it necessary for the landlord to indicate to the tenants that the lease would be strictly enforced and eviction could ensue. *See, e.g., Finn,* 42 *N.J.Super.* at 520

("A letter which had now become a form letter little heeded ... did not adequately bring home to them it was truly their last chance.")

Cases from other jurisdictions involving landlord/tenant agreements have also followed the general rule regarding alteration of contractual requirements for prompt payment through a course of dealing. *Humphrey v. Humphrey*, 254 *Ala.* 395, 48 *So.*2d 424, 427 (1950) (landlord's course of dealing of accepting overdue rent prevented forfeiture unless specific notice sent to tenant that it must strictly comply with the lease); *Prothro v. Walker*, 202 *Ga.* 71, 42 *S.E.*2d 114, 115 (1947) (When late rental payments are accepted, lessor cannot cancel lease in absence of prior service of reasonable notice on lessee that there must be strict compliance with written lease.); *Southern Hotel Co. v. Miscott, Inc.*, 44 *Ohio App.*2d 217, 337 *N.E.*2d 660, 663–64 (1975) (Since lessee had history of late payments of rent and on two prior occasions previous owner had sent lessee notices of delinquency but had not referred to forfeiture in notices, notice had to be given to tenant that strict compliance with terms of the lease was required prior to cancellation.); *Milbourn v. Aska*, 81 *Ohio App.* 79, 77 *N.E.*2d 619, 621 (1946) (Because lessor accepted several late rental payments without warning of termination, lease could not later be terminated for lessee's failure to make timely payment of rent, unless notice was given to tenant requesting him to comply with strict terms of the lease.); *accord Housing Auth. v. Allen*, 486 *So.*2d 1064, 1066 (La.Ct.App.1986) (municipal landlord who accepted late payments of rent cannot cancel lease without notice to tenant that strict compliance with lease is expected); *Park Forest of Blackman v. Smith, supra*, 316 *N.W.*2d at 445 (landlord who in course of dealing accepts late payments of rent cannot evict tenant without giving tenant advance notice of his intention to require strict compliance with the terms of the lease).

The *Smith* case is particularly instructive, since it addresses the way in which a late charge shapes the course of dealing. The *Smith* Court stated that a lease provision requiring a $5.00

late fee for late payments implied that this was the only penalty for late rental payment. *Smith,* 316 *N.W.*2d at 445. The *Smith* Court noted that the lease did not specify that tardy rent payment will be just cause for eviction. *Ibid.* The Rental Agreement in this case implies but does not expressly state that such is the case; it says that tenants are responsible for attorney fees if it becomes necessary for the landlord, *inter alia,* to seek legal services to evict for late payment. The Agreement, however, does not clearly state that late payment is a ground for eviction, nor did any letters received by the tenant.[2] The last four letters the tenants received all requested a late charge, while none of the letters received prior to the time the tenants were given Notice to Cease mentioned a late charge except for the one sent in response to non-payment and late payment. Indeed, applying the *Smith* rationale to the course of dealing between the parties here indicates that the landlord's actions progressively strengthened the tenants' expectation that late payment would not lead to eviction.

Cases concerning leased and rented items have also adhered to the general rule that a party "who has accepted late payments as a matter of course, must, before he may validly rely upon such a clause to declare a default ..., give notice to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided." *Nevada Nat'l Bank v. Huff,* 94 *Nev.* 506, 582 *P.*2d 364, 369 (1978) (citations omitted). *Accord Ford Motor Credit Co. v. Waters,* 273 *So.*2d 96, 100 (Fla.Dist.Ct.App.1973); *Cobb v. Midwest Recovery Bureau Co.,* 295 *N.W.*2d 232, 237 (Minn. 1980). We deem it appropriate to consider cases involving security interests because other courts considering landlord/tenant agreements have done so. *See, e.g., Village Dev. Co. v. Hubbard,* 214 *N.W.*2d 178, 182 (Iowa 1974), *Fritts,*

---

[2] The only letter that mentioned eviction was a response to both non-payment and late payment. This letter was sent prior to the tenants' receipt of the notice to cease.

*supra*, 478 *S.W.*2d at 13. Also, as the *Cobb* court notes, the right to rely on the course of dealings "is supported by the policy of the U.C.C. which encourages the continued development of 'commercial practices through custom, usage, and agreement of the parties.'" 295 *N.W.*2d at 237 (citations omitted). Our courts have looked to general principles of contract law in resolving landlord/tenant disputes—for instance, implied warranty of habitability cases. *See Marini v. Ireland*, 56 *N.J.* 130, 141–42 (1970).

None of these repossession cases uses a waiver analysis. In fact, *Huff*, *Waters*, and *Cobb* each specifically state that waiver is not the issue, since acceptance of late payments does not constitute a waiver. 582 *P.*2d at 369, 273 *So.*2d at 100, 295 *N.W.*2d at 236–37. Further, the courts in *Waters* and *Cobb* were faced with agreements containing non-waiver provisions—something not contained in petitioner's tenancy agreement.

In *Nevada National Bank v. Huff, supra*, 582 *P.*2d at 366–67, the debtor had a bad history of late payments, which were accepted as a matter of course by the creditor/lessor. The *Huff* court held that before the creditor/lessor could repossess the property, he needed to serve adequate notice on the debtor that strict compliance with the contract would henceforth be required if repossession was to be avoided. The court specifically noted that waiver was not the issue. Rather, it said "[t]he issue is the right of the debtor to rely on prior dealings between the parties and his right to be notified of the modification of any conduct of the creditor." *Accord Ford Motor Co. v. Waters, supra*, 273 *So.*2d at 100 (where seller of automobile consistently accepted late payments after sending notice of late payment to buyer, the buyer had right to be notified prior to repossession of modification in seller's policy); *Cobb v. Midwest Recovery Bureau Co., supra*, 295 *N.W.*2d at 237 (creditor has duty to notify debtor that strict compliance with contract terms would be required before property could be repossessed since none of the threatening letters sent mentioned repossession); *see Montgomery Enterprises v. Atlantic Nat'l Bank of Jack-*

*sonville,* 338 *So.*2d 1078 (Fla.Dist.Ct.App.1976), *Ford v. Rollins Protective Services Co.,* 171 *Ga.App.* 882, 322 *S.E.*2d 62 (1984). Again, these cases were not decided on the basis of waiver. Instead, they hinged on the right of the buyer to rely on the prior dealings that had taken place and to be notified of a modification of such conduct on the part of the creditor. *Waters,* 273 *So.*2d at 100.

Cases from other jurisdictions involving mortgage foreclosures have also followed this general rule. *Humke v. Taylor,* 282 *Ark.* 94, 666 *S.W.*2d 394, 396 (1984), *Curl v. Federal Sav. & Loan Ass'n of Gainsville,* 241 *Ga.* 29, 244 *S.E.*2d 812, 813 (1978). For example, in *Curl* the sellers never insisted on strict compliance with the agreement and frequently accepted delinquent payments. The *Curl* court stated that they needed to give reasonable notice of their intention to return to the specific terms of the contract. 244 *S.E.*2d at 813. It defined reasonable notice as that which affords the purchaser "a reasonable opportunity to cure any deviations from the exact terms before foreclosure can be commenced due to defaults which were tolerated ..." *Ibid.*

In sum, courts from this and other jurisdictions have held that terms of an agreement that permit a party to terminate it as a result of late payment become inoperative if there is a continued course of dealing of acquiescence to tardy payments. As these courts held, the favored party cannot terminate the agreement without first giving clear notice that the terms of the contract will, in the future, be strictly enforced.

Thus, we do not decide this case on the basis that the landlord's failure to evict tenants for sixteen months after service of Notice to Cease was unreasonable. Instead we hold that landlords must give clear notice and continue to give such notice to their tenants after a Notice to Cease is served. Such notice should state that the Notice to Cease remains applicable and continual habitual late payment of rent may lead to eviction. If the landlord's monthly late payment notices had clearly

stated that the tenant's continued failure to pay rent promptly would lead to eviction, the landlord's position in this case would be upheld. However, they did not. In fact, as noted, they became progressively less harsh. The last two letters did not even threaten "further actions." Moreover, the addition of a late charge in the last four letters created a confusing signal: it led Mrs. Band to expect that payment of the extra fee would "square" her account with the landlord. Consequently, their course of dealing made it necessary for the landlord to give notice to Mrs. Band that its right to prompt payment would be strictly enforced and that eviction would ensue if rent was not paid in a timely fashion.

We recognize that in a sense we are penalizing a landlord for dealing too tolerantly with its tenants. Nonetheless, the Legislature intended the Act to be remedial and to be liberally construed, particularly in view of the continuing critical shortage of affordable housing in this state. The Legislature envisioned that valid notice should serve the dual purpose of warning tenants that if certain conduct does not stop, eviction will result, and giving them an opportunity to correct that conduct.

We recognize that low-income tenants, ever vulnerable to eviction, will be particularly confused by ambiguous notices.[3] Low-income tenants are less likely to understand the consequences of a Notice to Cease that is followed by other notices that do not refer specifically to the Notice to Cease or eviction but merely to "further actions," or provide that a late charge will be added to the rent. Faced with paying for necessities that exceed their resources, many poor people first pay their most pressing debts. Hence, they will be more apt to forego paying their rent on time when faced with a competing necessity, particularly if they think the only consequence of their decision to delay the payment of rent will be to pay a $10.00 late fee. However, if follow-up letters make it clear that

---

[3]We permitted Legal Services of New Jersey to participate as *amicus curiae.*

habitual late payment of rent can lead to eviction, many tenants, similar to Mrs. Band, will pay their rent promptly; preventing eviction will undoubtedly be their most compelling necessity.

Accordingly, the judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN join in this opinion.

*For affirmance*—none.