**WESTINGHOUSE CREDIT CORPORATION,**
Plaintiff-Appellee,

v.

**Joe R. SHELTON, Sr., an individual, et al., Defendant-Appellant.**

No. 79–1116.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 18, 1980.

Decided April 9, 1981.

Michael L. Decker of Bay, Hamilton, Lees, Spears & Verity, Oklahoma City, Okl., for defendant-appellant.

Robert S. Payne, Oklahoma City, Okl. (Collier H. Pate, Oklahoma City, Okl., with him on brief) of Eagleton, Nicholson & Pate, Oklahoma City, Okl., for plaintiff-appellee.

Before SETH, Chief Judge, BREITENSTEIN, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

In this diversity suit applying Oklahoma law, defendant Joe Shelton appeals a summary judgment entered against him because of his default in payments on a retail installment contract for the sale of a mobile home. Plaintiff Westinghouse Credit Corporation became a creditor upon assignment of the contract from Shelton's seller. Westinghouse is a Delaware corporation with its principal place of business in Pennsylvania. Shelton is a citizen of Oklahoma. On summary judgment, the district court held that diversity jurisdiction had not been collusively created and that Westinghouse was not estopped from declaring Shelton's default under the contract. The district court also dismissed a counterclaim by Shelton alleging that Westinghouse's replevin of the mo-

bile home constituted conversion. We conclude that the district court properly invoked its diversity jurisdiction, but that it erred regarding the substantive state law governing the merits.

### Factual Background

The following facts are not in dispute. On May 23, 1974 Shelton bought a mobile home from an Oklahoma dealer, Greenfield Mobile World. The parties memorialized the sale in a "Retail Installment Contract— Consumer Paper." That contract called for Shelton to pay a time balance of $22,662.72 in 144 installments of $157.38 due on the 25th day of every month beginning with June 25, 1974. Under the contract, Shelton also granted Greenfield a security interest in the mobile home to secure his indebtedness. Dealer Greenfield assigned its contract rights to Amcourt Systems, Inc., and eight days after the sale Westinghouse purchased those rights for $13,931.91.

Before this litigation commenced, Shelton had paid roughly 40 of the 144 installments required by the contract, covering the period from June 1974 to December 1977. From the start, his payments were habitually late by one, two, and even three months. According to Westinghouse's payment records, only one or two installments were paid timely. In four instances, Shelton's check was returned for insufficient funds. Westinghouse, however, permitted Shelton to make good on the bounced checks, and throughout the 3½ year period it accepted all late payments.

By April 1978, Shelton had fallen in arrears on the installments due January, February, and March 1978. Each arrearage constituted a default under paragraph 3 of the contract, which defined default as including Shelton's failure "to perform or comply with any of the covenants or conditions of this agreement, or any note, in accordance with its terms or fail[ure] to pay any other indebtedness or any extension or renewal thereof." Rec., vol. I, at 5. Upon

default, Westinghouse had the option under paragraph 4 to "declare the entire principal amount of this Agreement or any other indebtedness to be immediately due and payable *without notice to the Buyer.*" *Id.* (emphasis added). Paragraph 6 of the contract contained an "anti-waiver" clause:

> "The waiver or indulgence of any default by the Buyer of any provision of this Agreement or any promissory note which it secures shall not operate as a waiver of any subsequent default by the Buyer of such provision or as a waiver of any of the other rights of [Westinghouse] herein. Time shall be deemed the essence of this Agreement."

Rec., vol. I, at 5.[1]

Relying on these provisions, Westinghouse filed suit on April 4, 1978. The complaint declared Shelton to be in default, accelerated full payment of the principal then remaining under the contract, and requested a writ of replevin to permit repossession of the mobile home. After a hearing to consider Shelton's objections, the district court authorized replevin on May 9.[2] On May 26, Shelton filed his answer and counterclaim alleging that Westinghouse's replevin constituted wrongful conversion. Thereafter, Westinghouse moved for summary judgment. The district court granted the motion, finding an absence of material fact issues and that Westinghouse was entitled to judgment as a matter of Oklahoma law.

### Issues

Shelton challenges the grant of summary judgment against him on two grounds: (1) the district court lacked subject-matter jurisdiction because diversity was collusively created, and (2) Westinghouse was estopped from declaring default under the contract when it did. Shelton's counterclaim that Westinghouse's replevin constituted wrongful conversion flows from his second contention.

---

1. The contract also provides that it "contains all of the Agreements between the parties relating to the installment sale of the mobile home." Rec., vol. I, at 5 (¶ 7).

2. By stipulation, the mobile home was later sold at a public sale on August 1, 1978. *See* Rec., vol. I, at 81.

## Jurisdiction

Shelton argues that the assignment of Shelton's contract was made solely to permit collection of Shelton's debt by Westinghouse and was thus collusively made to create diversity jurisdiction in violation of 28 U.S.C. § 1359. That section provides:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

■ The district court correctly rejected this contention. Shelton's seller, Greenfield, assigned all its creditor's rights under Shelton's contract to Amcourt Systems, Inc. "for value received." Rec., vol. I, at 5. Amcourt in turn assigned those rights to Westinghouse roughly four years before this suit commenced. Westinghouse paid $13,931.90. Shelton does not dispute these facts. Rather, he seizes upon language in the complaint, not found in either assignment to Amcourt or Westinghouse, that both assignees were authorized "to do every act and thing necessary to collect and discharge" Shelton's contract. Rec., vol. I, at 2. Westinghouse, Shelton thus contends, is like the collection agent in *Kramer v. Carribean Mills, Inc.*, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), whose assignment was found "improperly or collusively made" under 28 U.S.C. § 1359. There, a Texas attorney, for $1, obtained assignment of a legal claim held by a Panamian corporation against a Haitian corporation. The attorney promised in a separate agreement to pay the Panamian corporation a "bonus" of 95% of any recovery obtained on the assigned claim. The attorney then sued the Haitian corporation in the U. S. District Court for Texas' Northern District. The Supreme Court concluded that the attorney had been made a party merely to manufacture diversity jurisdiction and thereby to permit collection litigation in federal court of what remained essentially the Panamian corporation's cause of action.

The assignment to Westinghouse differs from that in *Kramer*. The undisputed circumstances indicate that it was a bona fide purchase for value of chattel paper made contemporaneously with an underlying installment sale of goods. Such transactions are typical in commercial practice. *See generally* 12A Okla.Stat.Ann. § 9–105 Oklahoma Code Comment & Official Comment 3. The assignee is usually a professional lender. In return for cash or its equivalent, the lender acquires the seller's right to receive or "collect" installments from the buyer, as well as the seller's security interest to secure the buyer's payments. The purpose behind such assignments is to leave the business of financing to the lender and to put the seller in a better working-capital position because he doesn't have to wait to realize the economic benefit from his sale of goods. But "collection" by the assignee-lender in this sense should not be confused with *Kramer*'s limited sense of "collection," that is, recovery on a money debt by litigation. For all that appears in the record, and Shelton has offered nothing in contradiction, the assignment to Westinghouse made four years before suit and for commercial purposes was neither "improperly" nor "collusively" made to permit diversity litigation in federal court. *See also Bradbury v. Dennis*, 310 F.2d 73, 76 (10th Cir. 1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963); *National Surety Corp. v. Inland Properties, Inc.*, 286 F.Supp. 173, 183–84 (E.D.Ark.1968), *aff'd*, 416 F.2d 457 (8th Cir. 1969). The district court properly invoked its diversity jurisdiction.

## Westinghouse's Declaration of Default

■ When Westinghouse filed suit in April 1978 and requested replevin relief, Shelton was indisputedly in default. Also not contested is the fact Westinghouse accepted all late payments in the course of the contract's performance from June 1974 to December 1977, and that almost all of the roughly 40 installments covering this period were paid late. This toleration, Shelton argues, precluded Westinghouse from suddenly declaring default without first apprising Shelton of its insistence on strict compliance with the contract's timeliness terms. Whether or to what extent

Shelton was actually apprised of such insistence is a fact vigorously disputed by the parties. Shelton argues this dispute precluded the grant of summary judgment. We conclude that beyond just the question of notification to Shelton, the overall issue whether in this case the parties' course of performance worked a waiver of one or more terms in their contract is a question for the factfinder. Summary judgment was therefore inappropriate. *See* Fed.R. Civ.P. 56(c); *Romero v. Union Pacific Railroad*, 615 F.2d 1303, 1305 (10th Cir. 1980). Our conclusion is based upon substantive contract law that we as a diversity court must apply as Oklahoma state courts would do. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Section 2–208 in Oklahoma's version of the Uniform Commercial Code provides:

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1–205).

"(3) Subject to the provisions of [section 2–209] on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

12A Okla.Stat.Ann. § 2–208. And section 2–209(5) says:

"A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

*Id.* § 2–209(5).

Focusing on sections 2–208(1) and (2), the district court held in essence that the express "anti-waiver" clause in paragraph 6 of the contract governed over the parties' course of performance, and that therefore Westinghouse's pattern of accepting late payments could play no role in "determin[ing] the meaning of the agreement." 12A Okla.Stat.Ann. § 2–208(1).[3] This hold-

---

**3.** The district court alternatively held in effect that the contract was solely a "security agreement" within the meaning of 12A Okla.Stat. Ann. § 9–105(h), and that section 2–208, a provision in Article Two of the Uniform Commercial Code governing only sales, could not apply to a secured transaction governed by Article Nine. We disagree with both conclusions. Section 9–105(h) defines "security agreement" as "an agreement which creates or provides for a security interest." Section 2–208 on course of performance refers to "contracts for sale," not to "security agreements." Section 2–106(1) defines "contract for sale" as including a "present sale of goods," that is, "a sale which is accomplished by the making of the contract." 12A Okla.Stat.Ann. § 2–106. Since Shelton's contract both accomplished a sale *and* created a security interest, it is not only a "security agreement" as the district court held, but also a "contract for sale." Therefore, section 2–208 reaches it.

The district court's second conclusion that section 2–208 on course of performance applies only to Article Two sales and not to Article Nine secured transactions is also incorrect as a matter of statutory construction. The Uniform Commercial Code is written so that definitions appearing in any particular Article usually apply only to transactions governed by that Article. For example, "contract for sale" defined in section 2–106(1) has meaning only "in this Article [Two]." Similarly, "security agreement," defined in section 9–105(h) has meaning only "in this Article [Nine]." *See* 12A Okla. Stat.Ann. §§ 2–106(1) (opening clause) & 9– 105(1) (same). However, definitions in Article One of the Code have meaning "in this Act," 12A Okla.Stat.Ann. § 1–201 (opening clause)— that is, they are automatically made a part of each article in the Code. Thus, an Article Nine "security agreement" is first an Article One "agreement," which "means the bargain of the

ing obviated the need to resolve the question of notification to Shelton. However, what the parties originally meant by the language in their agreement is clear: failure by Shelton to make payments at certain times would constitute default, and toleration by Westinghouse of one or more defaults should not be taken to mean Westinghouse was giving up the right to not tolerate others. The rub is whether or to what extent the parties, by the way they performed their obligations, modified the effect of the otherwise clear terms of their written agreement—or, to paraphrase section 2–208, did Westinghouse waive its right to strictly enforce the contract's terms, of which the "anti-waiver" clause is one, by accepting Shelton's late payments, a course of performance inconsistent with those terms. *See* 12A Okla.Stat.Ann. § 2–208(3). *See also id.* § 2–208 Official Comment 3.[4] If waiver by Westinghouse were found, the question of notification to Shelton would then bear upon whether Westinghouse properly retracted its waiver before seeking strict enforcement of the contract's terms. *See id.* § 2–209(5).

█ Absent an "anti-waiver" clause such as paragraph 6 in Shelton's contract, courts have uniformly held that a creditor may not fall into a pattern of accepting delinquent installments and then suddenly declare default, without first apprising the debtor of his insistence on strict compliance with the terms of the contract. *See, e. g., Knittel v. Security State Bank*, 593 P.2d 92, 95–96 (Okl.1979); *Lee v. Wood Products Credit Union*, 275 Or. 445, 551 P.2d 446, 448 (1976); *Nevada National Bank v. Huff*, 582 P.2d 364, 369 (Nev.1978). *See also* Ga.Code Ann. § 20–116 (where parties' course of performance departs from terms of contract, reasonable notice must be given of intention to rely on exact terms of agreement and until such notice departure deemed quasi new agreement). But courts have split over the significance of the parties' course of performance when the contract includes an "anti-waiver" provision, which in effect tells the debtor that the creditor's toleration of one or more defaults should not be taken to mean the creditor would indulge others. Some have construed the "anti-waiver" clause strictly according to its terms, thus conclusively precluding a creditor's pattern of accepting late payments from operating as a modification or waiver of the contract's default provisions. *See Hale v. Ford Motor Credit Co.*, 374 So.2d 849, 853 (Ala.1979); *Fair v. General Finance Corp.*, 147 Ga.App. 706, 250 S.E.2d 9 (1978); *Universal C.I.T. Credit Corp. v. Middlesboro Motor Sales, Inc.*, 424 S.W.2d 409, 411 (Ct.App.Ky.1968); *Home Finance Co. v. Frazier*, 380 S.W.2d 91, 93 (Ky.1964). But the weight of authority, and the view we think Oklahoma state courts would follow, is that an "anti-waiv-

parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1–205 and 2–208)." *Id.* § 1–201(3). Official Comment 3 to section 1–201 says:
"As used in this Act the word ['agreement'] is intended to include full recognition of usage of trade, course of dealing, course of performance and the surrounding circumstances as effective parts thereof, and of any agreement permitted under the provisions of this Act to displace a stated rule of law." *Id.* § 1–201 Official Comment 3. Since "agreement" is defined partly in terms of course of performance, "security agreement" must be as well. *Cf. Southwest Washington Prod. Credit Ass'n v. Seattle-First Nat'l Bank*, 19 Wash.App. 397, 577 P.2d 589, 594 (1978) (course of performance may amount to waiver of term in security agreement prohibiting disposition of collateral absent written authorization by secured party), *rev'd on other grounds*, 92

Wash.2d 30, 593 P.2d 167 (1979) (en banc). To the extent that *Universal C.I.T. Credit Corp. v. Middlesboro Motor Sales, Inc.*, 424 S.W.2d 409, 411 (Ct.App.Ky.1968), relied upon by the district court, can be read to the contrary, we believe that it is incorrect and that Oklahoma state courts would so conclude.

4. Comment 3 says:
"Where it is difficult to determine whether a particular act merely sheds light on the meaning of the agreement or represents a waiver of a term of the agreement, the preference is in favor of "waiver" whenever such construction, plus the application of the provisions on the reinstatement of rights waived (see Section 2–209), is needed to preserve the flexible character of commercial contracts to prevent surprise or other hardship."
12A Okla.Stat.Ann. § 2–208 Official Comment 3.

er" clause, like any other term in the contract, is itself subject to waiver or modification by course of performance and that whether such waiver or modification has occurred is a question for the factfinder. *See Smith v. General Finance Corp.*, 243 Ga. 500, 255 S.E.2d 14, 15 (1979) (disapproving of *Fair v. General Finance Corp.*, 147 Ga. App. 706, 250 S.E.2d 9); *Pierce v. Leasing International, Inc.*, 142 Ga.App. 371, 235 S.E.2d 752, 754–55 (1977); *Van Bibber v. Norris*, 404 N.E.2d 1365, 1373–74 (Ct.App. Ind.1980); *Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232, 237 (Minn.1980). *Cf.* 12A Okla.Stat.Ann. § 1–205 & Official Comment 2.[5] *See also Wade v. Ford Motor Credit Co.*, 455 F.Supp. 147, 150 (E.D.Mo. 1978) (pattern of accepting late payments operates as waiver of default as to previously accepted payments, but not as to yet unaccepted payments); *Fontaine v. Industrial National Bank of Rhode Island*, 111 R.I. 6, 298 A.2d 521, 523–24 (1973) (acceptance of late payments operates as absolute waiver of contract's default provision as to accepted payments and precludes creditor's declaration of default after timely payments have intervened); *Ford Motor Credit Co. v. Waters*, 273 So.2d 96, 100 (Ct.App. Fla.1973).

In Shelton's case the question is whether Westinghouse, by accepting late payments as it did, waived its right to strictly enforce not only the contract's time terms, but also the "anti-waiver" clause itself. Shelton

should have the opportunity to prove, if he can, that Westinghouse's conduct in toto regarding timeliness was so pervasive that in the eyes of a reasonable debtor it "spoke louder than [the] word," *Van Bibber*, 404 N.E.2d at 1374, of the "anti-waiver" clause, which in effect counseled against reliance on conduct indulging default.[6] If waiver by Westinghouse of the contract's timeliness and "anti-waiver" terms were found, the question whether or to what extent Westinghouse apprised Shelton, before taking him to court in April 1978, of its insistence upon strict adherence to the contract's terms would bear upon whether Westinghouse effectively retracted its waiver. *See* 12A Okla.Stat.Ann. § 2–209(5). In view of these fact questions, we must vacate the district court's summary judgment and the dismissal of Shelton's counterclaim, and remand for further proceedings.

Reversed and remanded.

---

**5.** Section 1–205 provides in part:

"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

"(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. *The existence and scope of such a usage are to be proved as facts....*" (Emphasis added).

Comment 2 provides:

"Course of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement. However, the provisions of the Act on course of performance make it clear that a sequence of conduct after or under the agreement may have equivalent meaning. (Section 2–208.)"

**6.** Westinghouse argues that wholly apart from late payment on the monthly installments, Shelton nevertheless defaulted by failing to maintain certain insurance on the mobile home as called for under the contract. This argument has little merit. Shelton authorized Westinghouse, as the contract expressly permitted, to procure the required insurance on his behalf and to charge him for it as part of the contract's total time balance. Thus, a default on any monthly installment necessarily amounted to a default regarding the required insurance. In short, the course of performance by Westinghouse relating to the monthly installments also related to the required insurance.