Ralph TILLQUIST Plaintiff,

v.

**FORD MOTOR CREDIT
COMPANY Defendant.**

Civ. A. No. N–85–533 (RCZ).

United States District Court,
D. Connecticut.

June 15, 1989.

Mark A. Shiffrin, New Haven, Conn., for plaintiff.

Jonathan J. Einhorn, New Haven, Conn., for defendant.

MEMORANDUM OF DECISION

ZAMPANO, Senior District Judge.

In this action plaintiff, Ralph Tillquist, seeks to recover damages against Ford Mo-

tor Credit Company (FMCC) as a result of the alleged wrongful repossession of plaintiff's automobile, and unfair collection practices.

A two-day bench trial was held at which several witnesses testified on behalf of both parties. On the basis of all the evidence presented at trial the Court concludes: (1) that plaintiff has failed to demonstrate that defendant engaged in any wrongful activity in connection with the repossession of plaintiff's automobile; (2) that plaintiff has sustained his burden of proof with respect to the unfair collection practices claim; and (3) that plaintiff has sustained his burden of proof with respect to a violation of the CUTPA.

## I. FINDINGS OF FACT

1. The plaintiff, Ralph Tillquist, is a citizen of the State of Connecticut.

2. The defendant, FMCC, is a sales finance company with an office in New Haven, Connecticut, but is incorporated in Delaware and has its principle place of business in Michigan.

3. In June 1983, plaintiff entered into a retail installment loan contract for the purchase of an automobile; this contract was assigned to FMCC to oversee the payment process.

4. According to the terms of the contract, plaintiff was to make payments of $189.03 on the fifteenth day of each month.

5. The contract also contained an anti-waiver provision which provided that acceptance of a late payment neither excuses the debtor's default nor condones late payments.

6. Plaintiff made his first payment late, made twenty-two of twenty-five payments late, was often two months behind in payments, and was three months behind in payments on two separate occasions.

7. While the contract was in effect, plaintiff hired Attorney JoAnn Faulkner to handle the problems associated with the payments under the agreement.

8. FMCC knew that plaintiff had hired Attorney Faulkner but continued to communicate directly with the plaintiff concerning collection of the late payments.

9. On or about September 28, 1985, plaintiff notified FMCC through his lawyer that he believed its records were in error and requested itemization of payments and inquired about the late charges.

10. At the same time plaintiff requested that collection efforts cease pending determination of the dispute.

11. On October 3, 1985, FMCC sent a statement of payments to plaintiff which included the late charges assessed against him for late payments.

12. As of Friday, October 18, 1985, plaintiff had failed to make payments in August, September and October.

13. On October 18, 1985, plaintiff's vehicle was repossessed by defendant's agents.

14. After the vehicle was repossessed, plaintiff's wife mailed one payment to FMCC on October 18, 1985.

15. Plaintiff's wife hand-delivered a second payment to FMCC's offices in North Haven, Connecticut, on October 19, 1985.

16. On Monday, October 21, 1985, the check mailed by plaintiff on October 18, 1985, was received by FMCC and deposited by it.

17. On October 21, 1985, FMCC forwarded a repossession notice to plaintiff.

18. The repossession notice stated that plaintiff could reinstate the contract within fifteen days from the date the notice was received.

19. The repossession notice also provided that the vehicle would not be sold until at least fifteen days after repossession and plaintiff could redeem the vehicle up until the time it was sold.

20. On or around October 25, 1985, plaintiff paid the repossession charges and other charges for the return of the automobile and reinstatement of the contract.

21. During the term of the payments defendant imposed late charges and extension charges for late payments and extensions.

22. Both before and after repossession, FMCC's representatives called plaintiff's residence on several occasions and spoke to his children about the debt. On one occasion, FMCC's representative told plaintiff's 14 year old step-son that he was "stupid" and that FMCC intended to repossess the vehicle because of the plaintiff's failure to make proper payments.

23. Both before and after repossession, FMCC's representatives frequently called plaintiff at his place of employment to discuss delinquent payments, even though plaintiff had told them not to contact him there because the calls were causing problems between himself and his employer, and the calls were embarrassing.

24. Prior to repossession, FMCC's representatives frequently called plaintiff's wife at her place of employment in order to discuss plaintiff's debt, even after she informed them that the calls were placing her job in jeopardy.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2. Connecticut law provides that when a security agreement contains an anti-waiver provision and the creditor has accepted late payments in the past, the creditor need not give notice that late payments are no longer acceptable prior to repossessing the property.

3. There is no Connecticut authority which indicates that a creditor cannot repossess a debtor's property when there is a bona fide dispute as to whether the debtor was in default.

4. The security agreement in question is controlled by the Connecticut Truth–in–Lending Act and, therefore, is exempt from coverage under the Connecticut Billing Error Act.

5. There is no Connecticut authority which maintains that a repossession notice, which inadvertently contains a mistake as to the amount owing, is commercially unreasonable under U.C.C. § 9–504(3).

6. The plaintiff has failed to sustain his burden of proof in showing that the repossession notice contained two different dates governing the time to redeem his vehicle.

7. Plaintiff has sustained his burden of proof with respect to several violations of the banking regulations which prohibit unfair collection practices.

8. Defendant did not violate the Connecticut Unfair Trade Practices Act because plaintiff failed to show a violation of any of the repossession statutes.

9. Plaintiff has demonstrated a violation of the Connecticut Unfair Trade Practices Act because plaintiff has successfully proven that FMCC violated several of the banking regulations.

## III. DISCUSSION

Plaintiff's cause of action consists of two counts. The first count alleges that the repossession of plaintiff's automobile was wrongful under § 9–503 of the Uniform Commercial Code (U.C.C.), and the Connecticut Billing Error Act. Furthermore, plaintiff claims that repossession was wrongful because defendant demanded prompt payments when it had continually accepted late payments.

The first count also asserts that the repossession notice was illegal because it demanded an amount which was not owing in violation of U.C.C. § 9–504(3), and it did not adequately describe plaintiff's rights because it gave different redemption dates in violation of the Retail Installment Sale Financing Act.

The second count of plaintiff's complaint alleges a violation of the Connecticut Creditor's Collection Practices Act, and the regulations thereunder issued by the Banking Department for unfair and harassing collection practices.

Plaintiff seeks statutory damages under the Uniform Commercial Code and the Retail Installment Sale Financing Act, and maintains that a violation of the repossession statutes and the Creditor's Collection Practices Act is an unfair trade practice under the Connecticut Unfair Trade Practices Act; thus, plaintiff contends that he may recover actual damages, punitive damages and attorney's fees.

## A. Wrongful Repossession

### 1. *Notice*

Plaintiff submits that when a creditor accepts late payments, repossession is wrongful unless there has been notice that strict compliance with the payment terms of the contract will be enforced. FMCC counters maintaining that the anti-waiver clause contained in the contract prohibits the application of this rule to the present matter.

■ With respect to security interest agreements, most jurisdictions adhere to the general rule that a party "who has accepted late payments as a matter of course, must, before he may validly rely upon such a clause to declare a default ..., give notice to the debtor that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided." *Nevada Nat'l Bank v. Huff*, 94 Nev. 506, 582 P.2d 364, 369 (1978); *Accord Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232, 237 (Minn.1980); *Ford Motor Credit Co. v. Waters*, 273 So.2d 96, 100 (Fla.Dist.Ct.App.1973). However, a split of authority exists when the contract contains an anti-waiver provision, which basically "tells the debtor that the creditor's toleration of one or more defaults should not be taken to mean the creditor would indulge others." *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869 (10th Cir.1981).

There are three schools of thought on the anti-waiver provision and its effect on the general rule. One line of cases has construed the anti-waiver provision as giving the secured party the right to take possession of the collateral without notice upon default. *Virgil Van Bibber, et al v. Norris*, 419 N.E.2d 115 (Ind.1981); *Hale v. Ford Motor Credit Co.*, 374 So.2d 849 (Ala. 1979); *Wade v. Ford Motor Credit Co.*, 455 F.Supp. 147 (D.C.E.D.Mo.1978). In contrast, a second line of cases holds that the anti-waiver clause is irrelevant because acceptance of late payments does not constitute a waiver of the secured party's right to demand prompt payments. These jurisdictions have decided that waiver is not the issue to be determined, but rather "the issue is the right of the [debtor] ... to be notified of a modification of such conduct on part of the [creditor]." *Waters*, 273 So.2d at 100. In reaching a determination of this issue, the courts essentially reverted to the general rule concluding that the debtor has the right to be notified of the secured party's demand of prompt payments. "The basis for imposing this duty on the secured party is that the secured party is estopped from asserting his contract rights because his conduct had induced the justified reliance of the debtor in believing that late payments were acceptable." *Cobb*, 295 N.W.2d at 236.

In *Westinghouse, supra*, the United States Court of Appeals for the Tenth Circuit expressed a third view with respect to the anti-waiver provision. The court concluded that it was possible for the creditor to waive the anti-waiver provision pursuant to basic contract principles as illustrated in Article 2 of the Uniform Commercial Code. *Id.* at 871–74. Arriving at this conclusion, the court reasoned that an Article 9 security agreement may also be a contract for a sale and, therefore, Article 2 principles are applicable. *Id.* at 872 n. 3. The court went on to state that U.C.C. § 2–208 permitted the creditor to waive its right to strictly enforce the contract's terms. *Id.* at 872–73. In analyzing the anti-waiver provision the court asserted:

> [T]he question is whether [the] [creditor] by accepting late payments as it did, waived its right to strictly enforce not only the contract's time terms, but also the "anti-waiver" clause itself. [The] [debtor] should have the opportunity to prove, if he can, that [the] [creditor's] conduct was so pervasive that in the eyes of a reasonable debtor it "spoke louder than [the] word," (citation omitted), of the "anti-waiver" clause, which in effect counseled against reliance on conduct indulging default.

*Id.* at 874. In other words, the court determined that, pursuant to U.C.C. § 2–208, it was possible for the creditor to waive the anti-waiver clause. If there was a waiver, in fact, the court concluded that the creditor would have to retract the waiver in

accordance with U.C.C. § 2–209 which states:

> A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

*Id.*

Although the Connecticut judiciary has not yet addressed the issue of waiver in a security agreement which contains an anti-waiver clause, it has considered non-waiver provisions in other types of agreements. For example, in *S.H.V.C., Inc. v. Roy*, 188 Conn. 503, 450 A.2d 351 (1982), the Connecticut Supreme Court discussed the effect of an anti-waiver clause in a lease agreement. In *Roy*, defendant argued that plaintiff had accepted late payments for over two years, thereby waiving its right to forfeiture.[1] The court, however, disagreed with plaintiff's contention and held as a matter of law that acceptance of late rental payments in and of itself was insufficient to establish a waiver in light of the anti-waiver clause contained in the lease agreement.[2]

Arguably, lease agreements and security agreements are two distinct types of agreements, and can be distinguished on several grounds; however, the anti-waiver provisions within the agreements are, for all practical purposes, identical. Thus, the Court must reluctantly conclude that *Roy* controls the issue at hand.[3]

Accordingly, the Court finds that FMCC was under no duty to give notice to the

plaintiff that late payments would no longer be acceptable prior to repossession.

### 2. *U.C.C. § 9–503*

■ Plaintiff's next argument is that FMCC violated U.C.C. § 9–503 by repossessing plaintiff's vehicle while there was a bona fide dispute as to whether the debtor was in default. To support this legal proposition, plaintiff relies on *Ford Motor Credit Corp. v. Byrd*, 351 So.2d 557 (Ala. 1977). In *Byrd*, defendant's agent went to plaintiff's home to discuss late payments with him. Plaintiff contended that his payments were timely and, at the agent's request, went to defendant's office in order to review the payment records. *Id.* at 558. While plaintiff was reviewing these records, defendant's agents repossessed the vehicle. *Id.* at 558–59. The Alabama Supreme Court determined that defendant repossessed plaintiff's vehicle by engaging in trickery and deception, resulting in a violation of U.C.C. § 9–503. *Id.* at 560.

The Court finds that plaintiff's reliance on *Byrd* is misplaced for two reasons. First, *Byrd* is factually unrelated to the situation *sub judice*. Here, no trickery or chicanery was used in repossessing plaintiff's automobile; FMCC used proper repossession methods. More important, in the present matter plaintiff knew that he was behind in his payments at the time of repossession. This in and of itself distinguishes the present matter from *Byrd* where plaintiff disputed there were late payments. Second, the *Byrd* interpretation of U.C.C. § 9–503 is not the law in Connecticut. Even if plaintiff's assessment of the *Byrd* decision was correct, there is no indication that the Connecticut Supreme Court

---

1. In *Roy*, plaintiff failed to raise the defense of waiver, but instead relied on the doctrine of estoppel; however, the court determined that the defense of estoppel and waiver are "nearly indistinguishable." *Id.* at 510, 450 A.2d 351. Therefore, in order to avoid confusion, this Court will continue to use the term "waiver."

2. *Id.* at 511, 450 A.2d 351. While *Roy* is binding precedent upon this Court, it should be noted that two of the justices dissented with the majority ruling. Justice (now Chief Justice) Peters, in a strong dissent, maintained that acceptance of late payments for two years "leads to the con-

clusion that the plaintiff cannot now peremptorily rely on the non-waiver clause in the lease to establish its right to retake the premises." *Id.* at 512, 450 A.2d 351.

3. Although the Court strongly disagrees with the majority opinion rendered in *Roy*, it is nonetheless bound to apply it in the case *sub judice*. Hopefully, the Connecticut Supreme Court will in the future reconsider its decision, but until that time arrives *Roy* would appear to govern anti-waiver provisions in the present context.

is about to initiate such a rule. Thus, the Court declines to adopt the standard enunciated in *Byrd.*

Accordingly, the Court finds that FMCC is not liable under U.C.C. § 9–503.

### 3. *The Connecticut Billing Error Act*

■ Plaintiff claims that FMCC also violated the Connecticut Billing Error Act (CBEA), Conn.Gen.Stat. §§ 42–84a and 42–84b, by failing to investigate or make corrections in plaintiff's statement of payments and by failing to respond to plaintiff's inquiry regarding the assessment of late charges. FMCC counters contending that the transaction in question is not controlled by § 42–84a because it is covered by the Connecticut Truth–in–Lending Act (CTLA), Conn.Gen.Stat. § 36–393.

Section 42–84a of the Connecticut General Statutes provides in relevant part:

> As used in section 42–84b, "retail credit transaction" includes any agreement or transaction for the retail sale of goods or services which are used or bought primarily for personal, family or household purposes, but it does not include transactions covered by chapter 4 of the consumer credit protection act, as defined in section 36–393.

Essentially, § 42–84a specifically excludes transactions which are governed by the CTLA. Therefore, the Court must now determine whether the CTLA controls the transaction in question.

The CTLA is the Connecticut counterpart to the Consumer Credit Protection Act, 15 U.S.C. § 1602. As such, the CTLA relies heavily on the federal statute in defining what type of transactions it encompasses. For example, § 36–393 of the CTLA provides: " 'Credit sale' means 'credit sale' as defined in Section 103 of the Consumer Credit Protection Act (15 U.S.C. 1602)." Section 36–393 of the CTLA also relies on the federal statute in defining the terms "credit", "consumer", "creditors", and "open-end credit plan." For purposes of the present case the relevant subsections of § 1602 are as follows:

> (e) the term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.
>
> (f) the term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness by agreement.
>
> (g) the term "credit sale" refers to any sale in which the seller is a creditor.

The Supreme Court has ruled that finance companies are creditors within the meaning of § 1602. *See Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1981). Courts have also held that credit is extended when a consumer incurs a debt and the parties agree to a repayment schedule which allows for deferred payment. *See Rogers Mortuary Inc. v. White,* 92 N.M. 691, 594 P.2d 351 (1979).

In light of § 1602, and relevant case law, it appears that the agreement between plaintiff and FMCC is encompassed within the Consumer Credit Protection Act, and, in turn, within the CTLA; thus, the CBEA does not control the agreement in the present matter.

■ Even assuming the transaction is covered by the CBEA, plaintiff has failed to show that defendant has violated it. Section 42–84b of the CBEA states:

> If a debtor ... believes that there is an error in such statement as to the whole or any part of the amount shown as owing to the creditor, he may ... so notify the creditor, stating the basis or reasons for his belief that the statement is in error. The creditor shall ... investigate the debtor's complaint and make the necessary corrections in such account and submit a corrected statement or send a written explanation to the debtor set-

ting forth the reasons why the creditor believes the account is correct as shown in the statement.

On September 23, 1985, plaintiff's counsel forwarded a letter to FMCC stating that plaintiff believed he had paid $577.00 more than was reflected in FMCC's records. No reasons were submitted as to why plaintiff believed that an error had been made; therefore, plaintiff failed to trigger the creditor's obligations under § 42–84b.

In that same correspondence, plaintiff inquired about collection letters, dated June 19, 1985, July 19, 1985, and August 19, 1985, which reflected a $10.00 increase in late charges between June to July, and a $20.00 increase between July and August. FMCC responded to this inquiry by sending an itemization of payments which included a statement of late charges. Plaintiff contends that FMCC failed to investigate, make corrections, or send a written explanation about the late charges, thereby failing to comply with § 42–84b.

The Court disagrees. Even if plaintiff's inquiry did require FMCC to comply with § 42–84b, the Court finds that FMCC did satisfy the requirements of that section. The itemization of payments clearly indicates that the $20.00 increase between July and August of 1985 were valid late charges for non-payment in the months of May and June of 1985. In addition, the itemization fails to show any increase of $10.00 between June and July. Thus, the Court concludes that FMCC did investigate the matter and sent a corrected statement of the late charges outstanding.

Accordingly, the Court finds that FMCC did not violate the CBEA.

### 4. U.C.C. § 9–504(3)

This claim essentially maintains that FMCC's repossession notice was commercially unreasonable, under U.C.C. § 9–504(3), because it demanded an amount not owing. From what can be discerned from plaintiff's post-trial brief, it seems that plaintiff is alleging that the repossession was made when only two payments were due, and, at the time the repossession notice was sent, FMCC had both payments in its possession and refused to accept one of them. Plaintiff contends that the repossession notice, which actually demanded three overdue payments, was commercially unreasonable and entitles him to statutory and punitive damages.

Plaintiff primarily relies on *Wilmington Trust Co. v. Conner*, 415 A.2d 773 (Del.1980) to support his position. In *Conner*, a creditor sent a debtor a repossession notice which contained an inflated balance. *Id.* at 776. The creditor, after selling the repossessed vehicle, sought a deficiency judgment against the debtor. The court held that the creditor was not entitled to a deficiency judgment since the repossession notice was commercially unreasonable pursuant to U.C.C. § 9–504(3). *Id.* at 777. Moreover, the court concluded that the debtor was entitled to statutory damages as a result of the commercially unreasonable notice. *Id.* at 781.

The Court finds the *Conner* decision unpersuasive for two reasons. First, the authority does not reflect the law in Connecticut, and it is doubtful that the Connecticut judiciary will expand U.C.C. § 504(3), Conn. Gen.Stat. § 42a–9–504(3), to prohibit mistakes on a repossession notice; thus, the Court declines to impose such a rule on a creditor that may have inadvertently made a mistake on the repossession notice. Second, even if this rule did apply, the Court fails to find a mistake within the notice. The testimony and documents presented at trial reveal that plaintiff was three payments behind at the time of repossession, and the repossession notice reflected this fact. Subsequent to the repossession, plaintiff had made payments on October 18, 1985 and October.19, 1985. Although the repossession notice, dated October 21, 1985, did not reflect these payments, it is logical to assume that FMCC did not have the opportunity to make these corrections. In the Court's opinion this does not constitute a mistake, but rather a lack of time in which to give notice of the proper amount due.

Accordingly, the Court finds that the repossession notice is not commercially unreasonable pursuant to U.C.C. § 9–504(3).

### 5. *Contradictory Redemption Dates*

■ Plaintiff also alleges that the repossession notice is misleading because it notified him that he could redeem his vehicle either within fifteen days of the date he received the notice (October 21, 1985) or within fifteen days from the date of repossession (October 18, 1985). Plaintiff argues that had he chosen to take the longer period offered to him by FMCC, he may not have been able to redeem the vehicle. Because of this potential exposure to lose the vehicle, plaintiff claims that the rights guaranteed to him by the Retail Installment Sale Financing Act (RISFA), Conn. Gen.Stat. § 42–83 *et seq.*, and U.C.C. §§ 9–504(3) and 9–507 have been seriously impaired.

Upon careful analysis of the repossession notice, the Court concludes that the notice indicates that plaintiff could have redeemed his vehicle at any time prior to the sale of the vehicle. According to the notice, this sale would not occur until at least fifteen days after the date of repossession (October 18, 1985). The other date, which plaintiff maintains is a second redemption date, is not a redemption date at all, but rather a date in which the contract could be reinstated.[4]

Accordingly, the Court finds that the repossession notice does not violate RISFA because it does not contain two different redemption dates.

### B. Unfair Collection Practices

### 1. *Creditor's Collection Practices Act*

Plaintiff's final claim consists of a violation of the Creditor's Collection Practices Act, Conn.Gen.Stat. §§ 36–243b, 36–243c, and the regulations thereunder, Reg. State Agencies § 36–243c. Specifically, plaintiff asserts that FMCC violated these regulations by: (1) calling the debtor at his place

of employment when the creditor knew it was inconvenient and embarrassing; (2) talking to the debtor's minor children and others residing with the debtor about the debt; (3) engaging in telephone conversations with the debtor in which he was required to reiterate his embarrassing problems to several different people; (4) threatening repossession before a certain date; (5) communicating with the debtor after knowledge that he was represented by an attorney; and (6) demanding an amount to redeem the car that was in excess of the amount that was actually due and owing.

■ The Connecticut Creditor's Collection Practices Act (CCPA) is the state counterpart to the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* Under the Connecticut act the banking commissioner is empowered to promulgate regulations "which are necessary to carry out the purposes" of the act. Conn.Gen.Stat. § 36–243c.

The Court finds that defendant has violated several of these regulations. The testimony and exhibits presented at trial indicate that FMCC's agents had knowledge that plaintiff was represented by Attorney Faulkner, but insisted on contacting plaintiff and his family members directly concerning late payments. This is in clear violation of § 36–243c–5(k) of the regulations which provides in relevant part:

a creditor may not communicate with a consumer debtor in connection with the collection of any debt:

(2) if the creditor knows the consumer debtor is represented by an attorney with respect to such debt and has knowledge of such attorney's name and address, unless the attorney fails to respond within a reasonable period of time ... to a communication of the creditor or unless the consumer debtor or attorney consents to direct communication with the consumer debtor, provided that a creditor may mail to a consumer debtor normal

---

**4.** Plaintiff's brief fails to analyze the difference between redemption and reinstatement. In order to redeem the property after repossession, the debtor must pay the entire debt owed on the property, which, in the present case, amounted

to approximately $5,000.00. On the other hand, in order to reinstate the contract and resume monthly payments, the debtor would have to pay the overdue payments, late charges and repossession charges.

periodic billing statements which do not contain any message that violates the provisions of ... these regulations.

In addition, the Court finds that FMCC also violated regulation § 36–243c–4(b) which provides in pertinent part:

... a creditor may not communicate, in connection with the collection of any debt, with any person other than:

(A) The consumer debtor;

(B) The consumer debtor's attorney;

(C) A consumer reporting agency ...;

(D) The creditor's attorney;

(E) The creditor's accountant;

(F) A consumer collection agency;

· (G) Any present, past or prospective creditor ...;

(H) Any corporation ...;

(I) Any person who is consultant to the creditor ...;

(J) Any person who is not the consumer debtor but who has paid or is paying all or part of the consumer debtor's debt;

(K) The banking commissioner and any employee of the banking division ...;

(L) Any person who is not a natural person and who is obligated to pay the consumer debtor's debt ...;

The evidence at trial demonstrated that FMCC's agents had phoned plaintiff's home on several occasions and talked with his children about the outstanding debt. There is no doubt that this type of activity is impermissible under § 36–243c–4(c) of the regulations.

 Moreover, there was evidence presented at trial which demonstrates a pattern of harassment by FMCC's representatives. For example, FMCC's representatives frequently phoned plaintiff's wife at her place of employment and discussed the debt with her, even after she had informed them that the calls were placing her job in jeopardy. In addition, there was uncontroverted evidence at trial that FMCC's agents continually called plaintiff at his place of employment after plaintiff had requested defendant to cease this activity.

Accordingly, the Court concludes that plaintiff has demonstrated violations of §§ 36–243c–4(a)2, 36–243c–4(a)2 of the banking regulations by FMCC and a pattern of general harassment throughout the course of the agreement.

## C. CUTPA

 Because plaintiff has sustained his burden of proof with respect to the violations of the banking regulations, the Court must determine whether a violation of these regulations is also a violation of the CUTPA.

In determining whether a practice violates CUTPA, the court should employ these criteria: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." *Sportsmen's Boating Corporation v. Hensley,* 192 Conn. 747, 756, 474 A.2d 780 (1984), quoting *Conaway v. Prestia,* 191 Conn. 484, 490–91, 464 A.2d 847 (1983). Thus, a violation of the CUTPA may be established by showing a practice amounting to a breach of public policy. *Web Press Services Corp. v. New London Motors, Inc.,* 203 Conn. 342, 355, 525 A.2d 57 (1987). A breach of public policy, in turn, may result form a violation of another statute. *See Barco Auto Leasing Corporation v. House,* 202 Conn. 106, 520 A.2d 162 (1987) (violation of RISFA also violated CUTPA); *Conaway v. Prestia,* 191 Conn. 484, 464 A.2d 847 (1983) (CUTPA creates a private cause of action for violations of §§ 47a–57 and 47a–5).

Plaintiff has proven that defendant has violated several of the banking regulations; therefore, the Court concludes that defendant's actions amount to a breach of public policy and in turn violate the CUTPA.

## D. Damages

Since plaintiff has sustained his burden of proof with respect to the violations of the CCPA and the CUTPA, the Court must now determine what plaintiff is entitled to recover.

■ Although the plaintiff has failed to show any actual damages resulting from the violations of these statutes, the Court in its discretion may award punitive damages and attorney's fees under the CUTPA. Conn.Gen.Stat. § 42–110g(a) and (d); *Gargano v. Heyman*, 203 Conn. 616, 622, 525 A.2d 1343 (1987). "In order to award punitive damages, evidence must reveal a reckless indifference to the right of others or an intentional and wanton violation of those rights." *Collens v. New Canaan Water Co.*, 155 Conn. 477, 489, 234 A.2d 825 (1967).

■ Because the evidence at trial clearly indicates that FMCC intentionally violated the banking regulations which resulted in embarrassment and humiliation to plaintiff and the members of his family, the Court awards plaintiff punitive damages in the amount of $500.00 and reasonable attorney's fees.[5]

## IV. CONCLUSION

For the above stated reasons, the Court awards plaintiff $500.00 dollars in punitive damages plus a reasonable attorney's fee.

IT IS SO ORDERED.

---

5. Plaintiff's counsel shall submit to the Court an itemized bill for attorney fees on or before June 26, 1989. Defendant's counsel shall have until July 7, 1989, to file an objection with supporting papers.