NEWMAN, Circuit Judge,
concurring.
I agree that it is appropriate to remand to the district court to resolve this dispute. I write separately because the court appears to ignore, or trivialize, the power and significance of Wilson’s consistent marking of 14 racket models with Frolow’s patent number during the life of the Fro *1316 low-Wilson License Agreement. Throughout the term of the Agreement, Wilson’s position was that these marked racket models were Licensed Articles, and by so marking the rackets Wilson received the benefit of the patent. This was not an inconsequential puff — it was an announcement and admission that the rackets were Licensed Articles under the contract.
Wilson represented to Frolow, and the world at large, that these rackets embodied Frolow’s technology and Wilson would pay Frolow royalties. Only when Frolow sought payment, did Wilson retreat. Frolow became aware of Wilson’s renege only after Wilson exploited the full value of Frolow’s patents as the exclusive licensee — so that Frolow could not license other racket manufacturers. At a minimum Wilson, not Frolow, bears the burden of showing whether Wilson should now (after patent expiration) be excused from paying for the benefit exclusively licensed from Frolow.
On remand Wilson bears the burden of coming forward with evidence adequate to show that it should not be held to its own long-standing belief that the marked rackets were Licensed Articles, a contract interpretation on which both parties relied for the entire life of the contract. I do not share my colleagues’ theory that the parties’ view of their contract throughout its term is merely “circumstantial evidence” of a royalty obligation due.
Disoussion
The Restatement (Second) of Contracts § 202 (1981) states that
Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.
Under New Jersey law, a course of performance is “the best indication” of what the parties meant by their Agreement. N.J. Stat. Ann. § 12A:2-208 cmt. n. 1 (“The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was.”); N.J. Stat. Ann. § 12A:2-202 cmt. n. 2 (“the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.”); see also N.J. Stat. Ann. § 12A:2-208(3) (“course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.”); N.J. Stat. Ann. § 12A:2-209(5) (waiver affecting an executory portion of the contract may be retracted only by “reasonable notification” and if not “unjust in view of a material change of position in reliance on the waiver.”).
Wilson states that its marking of the 14 rackets was “inadvertent.” The only record at trial and on appeal, however, is that the rackets were intentionally marked on Wilson’s belief that the rackets were “covered by” the claims of the licensed Frolow '372 patent. See Expert Report of W. Severa 50, ECF No. 38-5 (“the mis-mark-ing occurred under the mistaken impression that the racquets were covered by the claims of the '372 patent.”). Wilson has put forth no evidence of when its position changed. Frolow had no notice of Wilson’s changed position until after his audit. In such circumstances, a jury could determine that Wilson’s unexplained and repeated marking conduct constituted a *1317 waiver. See Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 874 (10th Cir.1981) (remanding contract dispute under U.C.C. § 2-209(5) for factual determination of whether creditor’s course of performance in accepting late payments constituted waiver and, if so, whether the creditor reasonably retracted the waiver “before taking [the debtor] to court.”). Wilson’s post-expiration test data is relevant only if the jury determines that Wilson should be permitted to change its position after Fro-low performed his obligations under the contract.
The same reasoning applies to the racket models on which Wilson had initially paid royalties. Indeed, in this very case, the district court relied on Wilson’s payments on racket head covers as a course of performance establishing that racket head covers were Licensed Articles. See Frolow v. Wilson Sporting Goods Co., 3:05-CV-04813-FLW, 2008 WL 8134447, at *22 (D.N.J. Mar. 31, 2008) (citing UCC § 2-208(1)). The court explained that
to the extent that the course of performance under the License Agreement shows that royalties were paid to Frolow based on sales of racquet head covers for racquet models that are Licensed Articles, those head covers are themselves Licensed Articles; conversely, to the extent that the course of performance under the License Agreement shows that royalties were not paid to Frolow based on sales of racquet head covers for racquet models that are Licensed Articles, those head covers are not Licensed Articles.
Id. Wilson did not appeal that ruling.
Frolow provided his technology to Wilson by exclusive license and could not grant licenses to others. He cooperated in Wilson’s lawsuits enforcing Frolow’s patents against Wilson’s competitors, see Wilson Sporting Goods Co. v. Head Sports, Inc., 98 C 1315, 1999 WL 89776 (N.D.Ill. Feb. 9, 1999) (alleging that “three of Head’s most popular tennis rackets infringe a patent held by Jack Frolow and licensed to Wilson Sporting Goods Co.”); Prince Sports Group, Inc. v. Wilson Sporting Goods Co., 91 F.3d 167 (Fed.Cir.1996) (“The baseline for this action is a subli-cense agreement ... whereby Prince was to pay Wilson royalties as its sublicensee under the Frolow patents.”).
Wilson admitted significant failures in payments to Frolow. On Frolow’s initial audit, Wilson admitted to unpaid royalties in the amount of $694,044.35, and tendered that amount to Frolow.
The majority opinion analogizes Wilson’s marking and payment activities to “a corporate officer admitting in a letter or at a deposition that the company’s product infringes a patent,” Op. at 1310, yet curiously does not put these admissions in the contract context and holds that the admissions do not relieve Frolow of the obligation of proving infringement. The majority ignores that Wilson’s “admissions” were made repeatedly, over a long period of time, with commercial benefit to Wilson, and in a manner consistent with accruing royalty obligations. A trier of fact could certainly find that Wilson’s conduct was more than a trivial “extrajudicial admission,” but was direct evidence of obligations under the Agreement.
Finally, the majority’s reference to the recently amended false marking statute, 35 U.S.C. § 292, is inapt. The false marking statute was a qui tam statute that provided a bounty for persons who spotted products marked with expired patents; it was amended to remedy litigation abuse. *1318 There is absolutely no relationship to the patent license and breach claims herein.
Conclusion
New Jersey statutes and precedent state the general rule that a party to a contract who establishes a course of performance of the contract, with no notice or objection, may be bound by that performance. Wilson’s “admissions” through marking and paying royalties on rackets are of great evidentiary weight in contract law, and place on Wilson the contract law burden of establishing that some different interpretation should now be placed on this expired contract. It is incorrect now to place on Frolow the patent-law burden of proving infringement as if there were no contract, no performance, no contrary interpretation and no reliance. Contract interpretation is a matter of contract law. Although I concur in remanding to the district court for further proceedings, I write separately to emphasize that these are proceedings under a contract that has been fully performed and whose term has fully run.